JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
Attorney for Defendant RAMOS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE IRMA E. GONZALEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 07CR3402IEG |
| Plaintiff, | ) | DATE: July 21, 2008 |
| | ) | TIME: 2:00 p.m. |
| v. | ) | |
| | ) | NOTICE OF MOTIONS AND |
| ISAAC RAMOS, | ) | MOTIONS TO |
| | ) | DISMISS THE INDICTMENT, |
| | ) | TO SUPPRESS STATEMENTS AND |
| | ) | EVIDENCE AND |
| Defendant. | ) | LEAVE TO FILE FURTHER |
| | ) | MOTIONS |

TO: KAREN HEWITT, UNITED STATES ATTORNEY;
     CHRISTOPHER ALEXANDER, ASSISTANT UNITED STATES ATTORNEY:

   **PLEASE TAKE NOTICE** that on July 21, 2008, at 2:00 p.m, or as soon

thereafter as counsel may be heard, the defendant, Isaac Ramos, by and

through his counsel, Kerry Bader, will ask this Court to enter an order

granting the motions listed below.

Dated: July 16, 2008                    /s/Joan Kerry Bader

                                        Joan Kerry Bader

//

//

//

//

//

//

1

**MOTIONS**

Defendant, Isaac Ramos, by and through his attorney, Kerry Bader, pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law and local rules, hereby moves this Court for an order to:

1)    dismiss the indictment;

2)    suppress statements and evidence and

3)    leave to file further motions.

This motion are based upon the instant motion and notice of motion, the attached statement of facts and memorandum of points and authorities, and any and all other materials that may come to this Court's attention at the time of the hearing on this motion.

Respectfully submitted,


Dated:  July 16, 2008          **/s/JOAN KERRY BADER**
                               Joan Kerry Bader
                               Attorney for Defendant Ramos

O7CR3402IEG

JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
Attorney for Defendant RAMOS

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE IRMA E. GONZALEZ)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 07CR3402IEG |
| Plaintiff, | ) | DATE: July 21, 2008 |
| | ) | TIME: 2:00 p.m. |
| v. | ) | |
| | ) | STATEMENT OF FACTS AND |
| ISAAC RAMOS, | ) | MEMORANDUM OF POINTS |
| | ) | AND AUTHORITIES IN SUPPORT |
| Defendant. | ) | OF DEFENDANT'S MOTION |

**I.**

**STATEMENT OF FACTS**

Mr. Ramos, by and through his counsel, Kerry Bader, presents the following information based in part on discovery provided by the Government thus far in this case. Mr. Ramos does not accept this statement of facts as his own and reserves the right to take a contrary position at motion hearings or trial. These facts alleged in these motions are subject to amplification and/or modification at the time these motions are heard.

On or about November 21, 2007, Mr. Ramos was arrested by the Border Patrol near Jamul, California with approximately five other people. He was charged with being a Deported Alien Found in the United States.

//

//

1

O7CR3402IEG

**II.**

**MR. RAMOS RESPECTFULLY ASKS THE COURT TO DISMISS THE INDICTMENT**

**A. Background**

In order to sustain a charge of Being A Deported Alien Found in the United States, the government must prove that Mr. Ramos is an alien, he has been deported before, and that he was found in the United States without having received prior authorization to re-apply for admission to the United States. United States v. Alvarado-Delgado, 98 F.3d 493 (9th Cir. 1996)(en banc);   United States v. Meza-Soria, 935 F.2d 166, 168 (9th Cir. 1991).

In order to prove the element of the prior deportation the government must prove that their was a legal, valid deportation prior to the finding of the person within the United States.

Here, there was no prior, lawful deportation, legal or otherwise, as will be discussed below.   See: United States v. Alvarado-Delgado, 98 F.3d 492, 493 (9th Cir. 1996): "A defendant's charge under section 1326 can preclude the government from relying on a prior deportation if the deportation proceeding was so procedurally flawed that it 'effectively eliminated the right of the alien to obtain judicial review.' United States v. Zarate-Martinez, 133 F.3d 1194 (9th Cir. 1998).

**B.   The defense presents the Court with government-issued discovery documents for the sole purpose of legal argument, not to support or prove the government's case**

Preliminarily, the defense advises the Court that it will attach various documents from the government that serve as exhibits associated with this motion.  The defense anticipates an argument by the government that the defense has heard in one other case, that by presenting these documents to the Court, the defense is "proving" the

07CR3402IEG

deportation.   To the contrary, the defense has no intention of proving the government's case.   The defense anticipates that the government would try to use these same documents to prove that Mr. Ramos has a previous lawful deportation.   This motion to dismiss the Indictment is in part set forth as an *in limine* motion in that a challenge to a deportation order is essentially a motion to exclude evidence.   *See generally,* United States v. Proa-Tovar, 975 F.2d 592, 595 (9th Cir. 1992)(en banc).

**C. Summary of Defense arguments**

The defense is moving the Court to dismiss the Indictment by asking the Court to exclude potential evidence, *i.e.* the government's documents provided in discovery.   The defense makes this motion on numerous grounds, including but not necessarily limited to the fact that use of the government's hearsay documents violate the holding of Crawford v. Washington, 124 S.Ct. 1354 (2004), and because they are the result of interrogation, not preceded by Miranda warnings, and because they comprise unreliable evidence.

In addition, the defense makes the motion by attacking the validity of the regulations and statutes that were relied upon by the government when it tried to deport Mr. Ramos.  Also, the defense attacks these rules on Constitutional grounds.

The procedures set forth in the atatutes and regulations here resulted in what this Court should deem an invalid deportation proceeding. (The defense will use the words "deportation" and "removal" interchangeably, recognizing they are legal terms of art that reference the legal procedures used to remove someone from the country based on his or her immigration status).   The actual procedure that took place in this matter rendered the deportation as void.

O7CR3402IEG

For all of these reasons, the Indictment should be dismissed.

**D. A review of the government's discovery**

The government's discovery indicates that an Immigration Enforcement Agent made a "Record of Deportable Alien" [RDA] in regard to Mr. Ramos on May 9, 2006, which states in relevant part"...Subject claims his wife and three USC children currently reside in Indio, California.  Subject claims no other ties, equities, or petitions pending with ICE." **Exhibit 1**.

**Exhibit 2** is a document dated by an Immigration Officer May 9, 2006, entitled, "Notificacion de Derechos y Solicitud de Resolucion" which is in Spanish and which _the Immigration Officer, ShiJie Fang, had already marked off the spot where she wanted Mr. Ramos to sign_ which would have had him admit that he was in the United States illegally, that he had no fear of returning to Mexico and that he gave up his right to see an Immigration Judge and that he wanted to be deported as soon as possible.

This occurred at 1500, presumably 3:00 p.m. and Officer Fang appears to have written that the Notice was read by the subject and read to him in Spanish.  Mr. Ramos did not even initial the document or adopt it in any way, not even where the Immigration Officer wanted him to waive his rights and be sent to Mexico as fast as possible.

On that same day, dated May 9, 2006, the same Immigration Officer Shijie Fang issued and signed herself a "Notice to Respondent." **Exhibit 3**.  It is Government Form I-862. _It is all in English without any Spanish translation._  The only part that bears what is probably Mr. Ramos's signature is in the section at the very

4

bottom of the form which says he received notice of the Notice to Appear that supposedly was read to him in Spanish.  *There is no signature next to the provision saying Mr. Ramos waived his right to have a ten day period prior to appearing before an Immigration Judge, despite the fact that again, the signature line is preceded by a hand=printed "x" indicating the Immigration Officer was pressuring him to waive his rights.  The fact that he refused to sign indicates he wanted a hearing before an Immigration Judge* and that he did not want to be rushed.

**Exhibit 4** is a Notice to Appear [NTA] apparently prepared by an officer named Michael Toms.  It is Form I-862.  There is no receipt by Mr. Ramos anywhere on this documents, nor initials.  The allegation is the Mr. Ramos is in the United States without having been admitted by an Immigration Officer.  It says, in capital letters: "YOU ARE ORDERED TO APPEAR" before an Immigration Judge at a time and place to be set.   The form is all in English.

**Exhibit 4** is followed by several other pages which have typed in "Cnotinuation for Form" and in a different font: "I-862" which may be an addendum, not signed by ShiJie Fang or Mr. Ramos. **Exhibit 5.**  This document spells out various allegations against Mr. Ramos, ranging from not so serious allegations, to more serious ones, including alleged prior convictions from Riverside County Superior Court.

There is a document called, "Warrant for Arrest of Alien" dated May 9, 2006, signed by Michael Toms and ShiJie Fang at 1450. **Exhibit 6.**

Mr. Ramos did sappears to have signed a  document also signed by Michael Toms that says he was detained by the Immigration

Service and that *he could "request a review of this [bond]*
*determination by an Immigration Judge."* **Exhibit 7**.  Clearly, Mr. Ramos
was under the impression he was headed to see an Immigration Judge and
that he might even be released on bond.

The Notice to Appear, Bond, and Custody Processing Sheet
dated May 9, 2006 also indicates the officers were well aware that Mr.
Ramos has a wife and three United States children within the United
States. **Exhibit 8**.

**Exhibit 9** is a Record of Deportable/INadmissible Alien which
reveals that Special Agent Leroy Odom **wrote in the middle of a dense**
paragraph on May 9, 2006 in his Record of Deportable Alien that Mr.
Ramos had received an approved I-130 Petition for Alien Relative.

At the end of the paragraph he wrote that Mr. Ramos had
advised him that he had a wife and three United States citizen
children in Indio, California. The last sentence which finishes on the
second page, states: "Subject claims no other ties, equities or
petitions pending with ICE."  There is no indication whatsoever that
Mr. Ramos adopted this report as his own statements.

The discovery then shifts in tone, starting with a new
Notice to Appear [NTA] **Exhibit 10**, which was issued on May 11, 2006,
two days after the original one.  It is from Eloy, Arizona, the
Executive Office of Immigration Review Detention Center, where Mr.
Ramos had been transported.  The allegations simply contained charges
of having entered the country without inspection, not being a U.S.
citizen and being a national and citizen of Mexico.

**Exhibit 11** is a form signed by Mr. Ramos requesting a
hearing before an Immigration Judge within ten days or less.

It is possible that the sudden shift from invoking his right

6

1  to a non-expeditious hearing on May 9, 2006, to a request for a

2  hearing before an Immigration Judge [IJ] on May 11, 2006, is realted

3  to the fact that the NTA of May 9, 2006, differs greatly from the one

4  prepared in Eloy, Arizona, on May 11, 2006 which has far less serious

5  allegations and now tha the was in Eloy, near an Immigration Judge, he

6  knew it was his time for his day in court and it appeared that the

7  Immigration Service had dropped serious charges. **Exhibits 4 and 5**

8       Then the government discovery also contains a document that

9  was issued by Patricia M. Vroom, Chief Counsel for the Department of

10  Homeland Security, U.S. Immigration and Customs Enforcement.  There is

11  no file stamp on this document yet nevertheless, it is headed with an

12  institutional address, the United States Department of Justice,

13  Executive Office for Immigration Review, Immigration Court in Eloy,

14  Arizona.  **Exhibit 12.**  This document has a heading stating:

15     "GOVERNMENT'S CONCURRENCE TO
       STIPULATED REQUEST FOR REMOVAL ORDER
16     AND WAIVER OF HEARING"

17

18     This form states:

19          Upon review of the respondent's administrative
       file and the attached documents, Department of Homeland
       Security, by and through counsel for the U.S. Immigration
20     and Customs Enforcement (ICE), concurs with the Respondent's
       request pursuant to 8 CFR section 1003.25(b) for the
21     Immigration Judge to issue a stipulated removal order
       without holding a hearing.  ICE waives appeal if the
22     Immigration Judge grants the request for stipulated removal
       order.  If the immigration Judge does not grant the request
23     for stipulated removal order, then the attached NTA will be
       deemed filed with the court for the purpose of scheduling a
24     full hearing before the immigration court, and ICE reserves
       the right to contest any and all issues that arise, and
25     further reserves the right to appeal any and all issues that
       arise in that hearing.
26          ICE will provide the respondent with a copy of
       this concurrence.  All inquiries and correspondence in this
27     matter should be directed to the undersigned government
       attorney who is handling this matter.

28

This document was signed, but there is no idea who signed it as the signature is illegible.  Neither is a name anywhere near the signature printed out to tell us who supposedly signed the document, there is just "Assistant Chief Counsel, ICE Eloy, Arizona."

The handwritten date is May 11, 2006 which is just two days after Mr. Ramos refused to sign a form where the INS wanted him to agree to be deported forthwith, without a hearing, and the same day as his request to have a hearing before an Immigration Judge.  For this reason alone, the indictment should be dismissed.

Next is **Exhibit 13,** which appears to be what the government would argue is an agreement, or stipulation by the parties to have Mr. Ramos deported.

**Exhibit 13** appears to be comprised of a total of four pages, but only the last page has signatures.  None of the rest of the pages have signatures or initials.

This "stipulation," which has no indication anywhere that Mr. Ramos saw, read, understood or agreed to much less signed or initialed, is followed in the discovery by a six page document that again is given the heading of the Immigration Court in Eloy, Arizona, without any file stamp and without any initials by Mr. Ramos. **Exhibit 13.**

This document states Mr. Ramos' name, that he received a copy of the Notice to Appear [NTA].

Recall **Exhibit 10**, where Mr. Ramos signed the area where he requested a hearing before an Immigration Judge, to the contrary, **Exhibit 13**, which looks like it was issued the same day, May 11, 2006, states: "I have also received a Legal Aid Services list."  There are a total of four pages, *none initialed by Mr. Ramos*.  The second page

states "I have been advised of my rights to be represented by an

attorney of my choice at my own expense, during these proceedings.  I

waive this right.  I will represent myself in these proceedings."

This is not acknowledged by Mr. Ramos in any way.  The next paragraph

states that "I have been advised that by signing this request, "I will

be giving up the following legal rights that I would have in a hearing

before an Immigration Judge."  This statement is on no way adopted or

acknowledged by Mr. Ramos.

        **Exhibit 13** continues:

        a) the right to question witnesses;
        b) the right to offer and to object to evidence;
        c) the right to require the government to prove my
removability.
        Knowing this, I waive these rights and request that my
removal proceedings be held without a hearing and that the immigration
Judge issue an order based solely on the written record.
        I admit that all of the factual allegations contained in the
NTA are true and correct as written... I agree and concede that I am
deportable or inadmissible as charged on the NTA.

        The following page contains a list of defenses, which is

incomplete as it does nto contain various well-known waivers such as

212(h) relief, and again, Mr. Ramos did no sign or initial it:

        I understand that I may qualify for one or more
forms of relief from removal, including voluntary departure.
I knowingly and intelligently waive my right to apply for
any relief e or protection from removal for which I may be
eligible under the Immigration and Nationality Act or any
other provision of law.  Such relief and protection may
include voluntary departure, adjustment of status,
suspension of deportation or cancellation of removal,
registry, naturalization, political asylum, withholding of
removal, and protection under the Convention Against Torture

        It is inconceivable that Mr. Ramos would have signed this

seeing how he had repeatedly invoked his right to see an IJ, and

indeed, there is no indication that he was made aware of this waiver

or that he accepted it, as there are no signatures or initials.

1   Moreover, considering he has lived in the U.S. over twenty years,
2   he has three United States children here and he had recently been
3   approved for adjustment of his status. Indeed, the Petition for Alien
4   Relative was filed for Mr. Ramos in March, 200, it is not likely he
5   would have entered into this stipulation. **Exhibit 14.**

6        By withholding this information that he had received
7   approval, the Immigration Service violated the INA in various ways, in
8   particular, by not permitting Mr. Ramos to inspect or rebut the
9   charges against him. 8 USC section 1228(b)(4)(C).

10       Several paragraphs down (paragraph 11), the form reads:

11

12   **11. ___ I have read or __x__ I have read to me in a language I**
13   **understand, this entire document.  I fully understand its**
14   **consequences.  I submit this request for removal voluntarily,**
15   **knowingly, and intelligently, i realize that by signing this document,**
16   **I will be removed from the United States....**

17   **12. I understand and agree that I will accept a written order for**
18   **my removal as a final disposition of these proceedings,...**

19   **13. I hereby waive appeal of the written order of removal.**

20       There are no initials or signatures on these pages.  The "X"
21   is typed in, already underlined not written in anyone's hand, in the
22   option where the person waives all his or her rights and agrees to be
23   deported without a fight.  Obviously the Immigration Service
24   preordains the outcome in these interrogations of inmates.

25       The next page sets forth paragraphs 14 and 15, paragraph 14
26   says:

27              I understand that, depending upon the facts and
             circumstances of my case, I cannot return to the United
28              States for a minimum of ten years, and possibly, forever,

1    without special permission from the Attorney General of the
     United States.  I also understand that returning without
2    proper permission could result in my being removed again
     and/or my prosecuted (sic) for illegal reentry which may
3    result in punishment for up to twenty years in prison.

4         Line 15 states: **"I hereby certify all the information I have

5    given in this stipulated request is true and correct."**  We cannot tell

6    who signed this document on the part of the Government because there

7    is no printed name under the signature line.  Thus we have no idea who

8    might be claiming to be the declarant here.

9         There are signatures below, dated May 10, 2006, Isaac Ramos

10   appears to be one of them, yet the other two are illegible which are

11   signature of an alleged "witness" with the initials that appear to say

12   "DO" after it and then a signature of an unnamed Assistant Chief

13   Counsel.

14        The fact that Mr. Ramos signed *this page only* (assuming it

15   is really his signature, and we have no way of knowing because the IJ

16   never confirmed with him that he entered into such an agreement),

17   suggests that Mr. Ramos *only saw this page, and none of the preceding*

18   *pages.*

19        *Assuming it is his signature, this page* simply tells him

20   that "depending upon the facts and circumstances of my case, I cannot

21   return to the United States for a minimum of ten years, and possibly

22   forever, without special permission....."  This sentence, which is the

23   very first sentence on the page, suggests to the reader that perhaps

24   he might have a positive outcome and that maybe he would not be

25   permanently banished from the United States.  It also suggests that

26   when signing the page, he was still under the impression he was going

27   to see an IJ, as he had been told he had a right to do so, and he had

28   invoked that right and that the facts and circumstances of his case

1 │ had still not been determined.

2 │      The flaws in this procedure, and the lack of a record and
3 │ the lack of adoption by Mr. Ramos of so many of the government-
4 │ requested concessions and the lack of oversight by the IJ which is
5 │ statutorily and constitutionally mandated makes this document null and
6 │ void.  Since there was no genuine deportation, the Indictment should
7 │ be dismissed.

8 │      Following this document, there is a two-page document
9 │ entitled "BIOGRAPHIC INFORMATION"" which is unsigned and not initialed
10 │ anywhere by Mr. Ramos.  **Exhibit 15.**  There were typed responses to
11 │ questions such as where he was born, when and where his parents were
12 │ born.  As to questions concerning marital status, spouse's immigration
13 │ status and that of any children, the answers are hand written, in
14 │ English.   They are not in any way adopted by Mr. Ramos.  "Yes/No"
15 │ answers are circled in what appears to be the same pen as that used to
16 │ provide the English answers.

17 │      The second form ends on the second page which has a hand-
18 │ written "x" before the sentence: "I certify that this document was
19 │ read to the alien in its entirety in the Spanish language."  This is
20 │ followed by the statement: "I certify that all the information,
21 │ relating to the alien, contained in the document above was voluntary."
22 │ This was signed not by Mr. Ramos, but by a Deportation Officer,
23 │ Christina Olson, DO.  Never was it adopted by Mr. Ramos.  Nor was it
24 │ ever reviewed by an Immigration Judge with Mr. Ramos.

25 │      The responses on the Biographic Information form indicate
26 │ that Mr. Ramos has three U.S. citizen children, that he had not ever
27 │ had immigration documents issued by the U.S. government to him.  That
28 │ to the best of his knowledge, no petitions were filed on his behalf

with the Immigration Service, which, we know, is a lie or
misrepresentation by the Immigration Service, because the government's
own A-file reveals the approved request for Adjustment of Status,
stamped by the INS, and because Officer Odomnoted it.

This is proof that the INS misadvised Mr. Ramos and for this
reason alone the proceedings were flawed and the Indictment should be
dismissed.  Minimally, it is proof that the documents that the
government wish to attribute to Mr. Ramos, assuming for the sake of
argument they were adopted by him, were not adopted by him with a full
understanding of his rights, the facts and the consequences of giving
up his rights.  The fact that the Immigration Service also failed to
tell him he had an approved I-130 shows that he did not voluntarily
enter into any agreements that the government may wish to attribute to
him.

For one, if he had an I-130 approved, he could have sought
relief under section 1102(h) of the INA (a "212(h) waiver").  This
section allows non-Lawful Permanent Resident [LPR] aggravated felons
to obtain a waiver of removal if they are the spouse, son, daughter or
parent of a United States citizen or LPR who would suffer extreme
hardship if the alien were deported   Matter of Michel, 21 I @ N Dec
1191 (BIA 1998)(person with aggravated felony conviction, and approved
petition, eligible for Adjustment of Status under section 212(h)
because he was not an LPR previously.).

However, because the Immigration officers decided not to
advise Mr. Ramos of this petition, and took it upon themselves to hide
the truth from him and to make his decisions for him, they prevented
him from asserting his right to try to raise his defense by placing
him in expedited proceedings where he would not be able to raise the

defense even if he had been advised. INA section 1228(b)(5).

The  appeared to have led him on by issuing a second Notice to Appear [NTA] in which he was charged with far less serious grounds for removal, which would have signaled to him that perhaps he had a chance to remain in the country, because the Immigration Service had dropped or lowered the charges to mere allegations of not being a U.S. citizen, being a Mexican national and citizen and having entered without inspection.

The other proof that the Immigration Service was making all of the procedural and substantive decisions in this case stems from the failure of the Immigration Service to honor Mr. Ramos' request to see an Immigration Judge, which is clearly what he wanted to do and what he thought he was going to be able to do.

**E.  The Immigration and Naturalization Act is does not sanction the kind of procedure that the INS practices here as shown here**

Section 1228 if the Immigration and Naturalization Act (hereinafter "INA") is entitled: **Expedited removal of aliens convicted of committing aggravated felonies**.  Section 1228(a)(1) states that "...Such proceedings shall be conducted in conformity with section 1229a of this title (except where otherwise provided).  Section 1228(2) mandates that where someone is convicted of an aggravated felony and he or she is detained in a facility with other such aliens, the Attorney General shall make reasonable efforts to ensure the aliens' right and access to counsel are upheld.

Section 1228(b) governs the rights of non permanent resident aliens who are convicted of aggravated felonies and who are in deportation proceedings.  Under subsection (3) the Attorney General cannot execute a deportation or removal order until 14 days have

passed from the date of the order being issued, unless the alien

waives that right, which is designed to give the alien an opportunity

to apply for judicial review.  Note in this case, Mr. Ramos was served

on May 9, 2006, at which time he affirmatively requested a hearing

before an IJ and waived his right to be heard within ten days of the

notice.  If he was ordered deported and actually deported within two

days, the 14-day rule was violated as was Mr. Ramos' request to be

heard by an IJ and his request to have more time.

Returning to INA section1 1228a:

Subsection (4) says that these proceedings shall be in

accordance with the Attorney General's regulations and

(A) the alien is given reasonable notice of the charges and

of the opportunity described in subparagraph ©) [below];

(B) the alien shall have the privilege of being represented

(at no expense to the government) by such counsel....

C) the alien has a reasonable opportunity to inspect the

evidence and rebut the charges;

(D) a determination is made for the record that the

individual upon whom the notice for the proceeding under this section

is served (either in person or by mail) is, in fact, the alien named

in such notice;

(E) a record is maintained for judicial review; and

(F) the final order of removal is not adjudicated by the

same person who issues the charges.

The record shows that subsections C) and (E) were not

complied with here, as there was no opportunity for Mr. Ramos to

inspect the discovery and to rebut the charges, and there was no

determination made for the record by the IJ, as there was no record

made, much less was it reviewed by the IJ and all we have here are the government's documents.  There is no transcript, no appellate record, no record at all kept by the IJ.

Section 1229(2) of the INA spells out the notice of time and place of removal proceedings that must be afforded to the alien, which must be done in writing and which must allow the alien ten days before such hearing is scheduled, "unless the alien requests in writing an earlier hearing date."  The government cannot get around this, by claiming that one day later they convinced Mr. Ramos to waive his right to judicial review.  He already claimed the right and they went ahead and talked him out of it anyway.  This is not sanctioned by the statute – it is prohibited.

INA section 1229a, entitled, **"Removal proceedings"** sets forth in the first subsection. (a)(1) Proceeding.  In general.  "An immigration judge *shall* conduct proceedings for deciding the admissibility or deportability of an alien." (Italics added).

Under subsection 1229a(b) the "authority of the Immigration Judge" is stated: "The Immigration Judge *shall* administer oaths, receive evidence, and interrogate, examine and cross examine the alien and any witnesses.... (italics added).

Subsection (2) sets forth the form of the proceeding, which in general, may take place in person where agreed to by the parties , in the absence of the alien, or by video or telephone...

Subsection (4) again guarantees an alien's right to counsel at his or her own cost, as well as the "reasonable opportunity to examine the evidence against the alien, to present evidence on his own behalf, and to cross examine witnesses presented by the government. Additionally, the statute under subsection C requires that a record be

kept of all testimony and evidence.

Here Section1 229a(a)(1) was violated: the IJ never took oaths, he has no idea who signed the page that may or may not be page four of a stipulation, he never conducted a proceeding as is required by the word "shall."

Thus, 8CFR section 1003.25 conflicts with the statute that requires the IJ to preside over the proceedings, to administer oaths and to make the determination him or herself as to whether the Respondent is admissible or removable.  The statute does not leave this up the Immigration Service.  It is not reasonable to do so, anyway, because the role of the Immigration Service is to deport people.  it is one thing to hand an IJ a stipulation, it is totally different, though, to not review it with the parties.

INA section 1229ac)(1) the IJ *shall* decide whether an alien is removable from the United States.  The determination may only be based on the evidence produced at the hearing.  Subsection (3) places the burden of proof on the Immigration Service to prove the alien is deportable which must be based on reasonable, substantial and probative evidence.  "Proof of convictions" must be either and official record of judgment and conviction, or plea, verdict or sentence, or a docket entry indicating such or official minutes if a court proceeding or transcript or an abstract of record prepared by the court where the conviction occurred or by a state official with associated with the State's repository of criminal justice records.

If and when the IJ decides the alien is removable and makes such an order, "the judge shall inform the alien of the right to appeal that decision..." INA section 1229ac4.

Here, the statute was not followed as there is no evidence

1  that the IJ saw any of this "proof" before he signed a removal order

2  for Mr. Ramos.  The Immigration Service never sustained its burden,

3  and the IJ did not do as he was mandated, to decide if Mr. Ramos was

4  to be removed.  Instead he issued an order, without ever talking to

5  the Respondent and without ever confirming for himself that the

6  documents that the INS prepared were ever actually seen, read or

7  understood in part or *in toto* by the Respondent.  We do not even know

8  if the IJ the documents, as there is no "record of the proceeding"

9  which the statute requires.

10       Also, section 1229(b) of the INA states the IJ "shall

11  administer oaths" yet none of the documents produced by the

12  Immigration Service are sworn to.  At best, **Exhibit 13** states "I

13  hereby certify all the information I have given in this stipulated

14  request is true and correct."  A certification is not an oath and the

15  IJ never administered an oath here, thereby, again, making this

16  document null and void for yet another reason.

17       In the case at bar, by utilizing 8 CFR section 1003.25 the

18  government utilized section 1003.25 of Title 8 of the Code of Federal

19  Regulations [CFR] the Immigration service circumvented the rules

20  spelled out by Congress in the Statutes.  That provision, which was

21  promulgated by the Attorney General, not Congress, is entitled **"Form**

22  **of the proceeding."**  It states in pertinent part:

23       (a) *Waiver of presence of the parties. ....*

24       (b) *Stipulated request for order; waiver of hearing.*  An

25  Immigration Judge may enter an order of deportation, exclusion or

26  removal stipulated to by the alien (or the alien's representative) and

27  the Service.  The Immigration Judge may enter such an order without a

28  hearing and in the absence of the parties *based on a review of the*

*charging documents, the written stipulation, and supporting documents, if any.  If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing and intelligent.* {italics added]. The stipulated request and required waivers shall be signed on behalf of the government and by the alien and his or her attorney or representative, if any.  The attorney or representative shall file a Notice of Appearance in accordance with section 1003.16(b).  A stipulated order shall constitute a conclusive determination of the alien's deportability or removability from the United States.  The stipulation shall include:

(1) An admission that all factual allegations contained in the charging document are true and correct as as written;

(2) A concession of deportability or inadmissability as charged;

(3) A statement that the alien makes no application for relief under the Act;

(4) A designation of a country for deportation or removal under section24(b)(2)(A)(i) of the Act;

(5) A concession to the introduction of the written stipulation of the aliens as an exhibit of the Record of Proceeding;

(6) A statement that the alien understands the consequences of the stipulated request and that the aliens enters the request voluntarily, knowingly and intelligently;

(7) A statement that the alien will accept a written order for his or her deportation, exclusion or removal as a final disposition of the proceedings and

(8) A waiver of appeal of the written order of deportation or removal.

07CR3402IEG

1      *(C) Telephonic or video hearings.*  An immigration Judge may
2  conduct hearing through video conference to the same extent as he or
3  she may conduct hearings in person.....

4      Based on the statutes alone, the defense asks the Court to
5  dismiss the Indictment because, as the following argument will show,
6  the statute and the regulations are unconstitutional on their face and
7  as applied.  The other objection is that the government did not follow
8  the statutes and regulations and in failing to do so, violated Mr.
9  Ramos rights.

10     Moreover, 8 CFR section1 1003.25 conflicts with the
11 statutory requirements set forth in INA section 1228 and 1229a because
12 the regulation does not require the immigration service sustain its
13 burden of proof, it does not require the IJ to create a record or take
14 oaths, evidence, or sworn testimony and it does not require the IJ to
15 make a determination of excludability or admissibility.

16     In short, the Code of Federal Regulations, section 1003.25,
17 which authorizes this procedure is unconstitutional on its face and as
18 applied because it negates Due Process which is afforded to persons in
19 deportation and/or removal proceedings.  The code section allows for
20 an assembly-line procedure whereby respondents are not advised by
21 unbiased unconflicted counsel and where they are not privy to the
22 legal paradigm, rules or rights to which they are entitled and to
23 which they are being strong-armed into by a much greater party
24 opponent.  Instead, the Immigration service is giving them "legal
25 advice" while coercing them into commonly  uncounseled, and always
26 unsupervised contractual agreements.

27     Accordingly, Mr. Ramos respectfully asks this Court to
28 dismiss the indictment because the removal proceeding that the

1  government is relying on for its prosecution of Mr. Ramos is not

2  constitutional. U.S. Const. Sections IV, V and VI

3        **F.  In light of the varied legal problems associated with 8**

           **CFR section 1003.25 and accompanying statutes, Mr.**

4             **Ramos respectfully asks this Court to rule as**

           **Unconstitutional the regulation (8CFR section 1003.25)**

5             **and the statutes (INA sections 1228(b)(5) and**

           **1229a(b)(2)(A)(ii) on their face and as applied in this**

6             **case**

7      In summary, 8 CFR section 1003.25 permits the IJ to issue an

8  order of removal by stipulation of the parties, *i.e.,* the Immigration

9  Service and the Respondent.  Section 1228(b)(5) prevents a respondent

10 in an expedited removal proceeding from claiming any defense or waiver

11 of removal that the Attorney General may grant in its discretion, such

12 as INA section 1102(h) (212(h) waiver).  INA section

13 1229a(b)(2)(A)(ii) allows a removal to take place in the absence of

14 the alien, where the parties agree.

15       Mr. Ramos asks the Court to rule these provisions as void on

16 their face and as applied in this case under the Fifth Amendment's

17 right to Due Process.  For one, as in the criminal context, an

18 ordinance will be void for vagueness if it fails to give notice to

19 people of ordinary intelligence concerning the conduct proscribed or

20 if it invites arbitrary enforcement.  The Supreme Court has indicated

21 that the arbitrary enforcement element is more important.  <u>Diversified</u>

22 <u>Numismatics, Inc. V. Orlando</u>, 783 F, Supp. 1337 (D. Fla. 1990).

23     Here, Mr. Ramos was never advised by the Immigration Judge that

24 he would in all likelihood be banished from the country permanently;

25 therefore, he could not know how to conform his conduct.  He was

26 misled by the Immigration Officers who issued varying Notices to

27 Appear, which contained his right to see an IJ which they never

28 permitted him to do and which contained varying degrees of serious

1  allegations supporting the Immigration Service' charges of removal.

2       Ultimately, we do not know which allegation Mr. Ramos based his

3  decision, if any at all, and therefore, he could not have been

4  apprised properly of the requirement that he not return to the

5  country.  This procedure also exhibits "arbitrary and discriminatory

6  enforcement" whereby the officers can withhold evidence such as the

7  approval for Adjustment of Status, not only from the Respondent, but

8  from the Court as well, so that the Respondent is unable to make a

9  voluntary, knowing decision as to how to handle his case. <u>Grayned v.</u>

10 <u>City of Rockford</u>, 408 U.S. 204 (1972).

11            INA section 1228(b)(5) only exacerbates the possibility

12 of arbitrary and discriminatory enforcement because the Immigration

13 Officers can determine a Respondent's fate, who otherwise might

14 request a waiver, by simply placing him in expedited removal

15 proceedings for aggravated felons who would or could otherwise raise

16 the waiver issue before an IJ, as is their right, even as an

17 aggravated felon. "A vague law permissibly delegates basic policy

18 matters to policemen, judges and juries for resolution on an *ad hoc*

19 and subjective basis, with the attendant dangers of arbitrary and

20 discriminatory application. <u>Id.</u>

21            INA section 1229a(b)(2)(A)(ii), which allows a removal to

22 take place in the absence of the alien, where the parties agree, is

23 particularly susceptible to arbitrary, discriminatory or subjective

24 application.  As shown here, if the Immigration Service wants to hide

25 evidence, mislead the Respondent or the IJ, or discourage a Respondent

26 from asserting his rights and/or possible defenses, it can and it

27 will.

28            If this statute is to be saved, at most, the only way it can

1   be salvaged is to ensure that the IJ determines for him or herself, by

2   directly speaking with the Respondent and by reviewing the _complete_

3   record that the Respondent, truly wants to, and voluntarily and

4   intelligently waives his or her right to a hearing and is completely

5   amenable to stipulating to a removal order.  This judicial oversight

6   is needed to safeguard rights such as those set forth in Rule 11b of

7   the Federal Rules of Criminal Procedure.  At the very least, these

8   safeguards should be in play for unrepresented Respondents.

9           By failing to have the Respondent speak personally with the

10  IJ, _the IJ is abdicating his or her duties under the INA and 8 CFR_

11  _section 1003.25_ to review the record, to ensure that the stipulation

12  is made voluntarily, intelligently and knowingly and to advise the

13  Respondent of any possible relief from deportation. United States v.

14  Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000)  As shown in this case,

15  these duties cannot be ensured without direct contact with the record

16  and the Respondent by the IJ.

17          The other problem with 8 CFR is that it conflicts with INA

18  section 1229a(b)(1) which say the IJ "shall ...receive evidence..."

19  and with 1228(b)(4)(E) that requires a "record [be] maintained for

20  judicial review" because it only requires that the IJ enter an order

21  of removal without a hearing and "in the absence of the parties based

22  on a review of the charging document, the written stipulation of the

23  parties, and any supporting documents."   Again, the procedure allows

24  the Immigration Service to keep evidence from the eyes of the

25  Respondent or the IJ and it prevents the IJ from acting as a referee

26  and an advisor to the Respondent, a responsibility that is completely

27  gutted by the "stipulation" procedure.

28          The Immigration Judge is presumed to be intimately familiar

23                                           O7CR3402IEG

with the Immigration Codes and regulations and is to relay them to the Respondents. *See:* <u>Moran-Enriquez v. INS</u>, 884 F.d 420, 423 (9th Cir. 1989). <u>Moran-Enriquez</u> held that an IJ must advise even those aliens who "do [] not have <u>the wherewithall to make a complete showing of eligibility</u>" and "[w]e read the 'apparent eligibility' standard to mean that where the record , fairly reviewed by an individual who is intimately familiar with the immigration laws — as IJs no doubt are — raises a reasonable probability that the petitioner may be eligible for relief, the IJ <u>must</u> advise the alien of this possibility." The requirement to properly advise individuals of their eligibility for relief is "mandatory." <u>United States v. Arrieta</u>, 224 F.3d at 1079. (Emphasis added).

The INS' own regulations require this as well. Pursuant to 8 CFR section 242.17(a) and IJ must "inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph and shall afford the [alien] an opportunity to make application therefor."

The fact that the regulation does not require the IJ to review the record *alone* makes this particular CFR section unconstitutional, never mind that it prevents the Immigration Judges from doing their jobs.

Moreover, the regulations require the IJ to grant a continuance to the alien to make such applications for relief. None of that occurred here. On May 9, 2006 Mr. Ramos asked to see the IJ, he did not waive elect to have a speedy hearing within ten days; instead, if the documents are genuine, he clearly wanted a hearing and he wanted to take his time, probably because he had been in the United States for twenty years, and because he was married to an LPR and his

1  three children all under the ages of twenty, are U.S. citizens.

2  **Exhibit 14**.   The Immigration Officers blatantly ignored his requests

3  and invocations.

4          The defense makes Reference to INA section 1228c) which

5  authorizes a District Court Judge to enter an order of removal at

6  sentencing of a criminal alien.  Not only does this procedure afford

7  the alien the opportunity to examine the charges and evidence against

8  him, and to rebut them, but the process assumes the District Court has

9  already gone through a Rule 11(b) procedure as set forth under the

10 Federal Rules of Criminal Procedure. *See*: Rule 11(b) of the Federal

11 Rules of Criminal Procedure.  That section mandates that the court

12 taking the plea "must address the defendant" and inform him or her of

13 her rights, including her right to be represented by counsel and her

14 right to obtain witnesses and evidence, all the potential penalties

15 and sanctions and the Court "must address the defendant personally in

16 open court and determine that the plea is voluntary and did not result

17 from force, threats or promises" outside the plea agreement, or,

18 contract. which *require* the District Court to address the defendant

19 personally in open court, to have address the defendant of his rights

20 (not the prosecutor), and to advise the defendant of the charges he is

21 facing and the maximum possible penalties, which a removal order

22 arguably is.

23     The IJ, like the District Court should be required to "address

24 the defendant personally, in open court" to determine for the plea is

25 voluntary and the Court is required to obtain a factual basis for the

26 plea.  The District Court is also obligated to let the defendant know

27 he has a right to withdraw his or her plea.

28          In the case such as this where the IJ never even sees the

Respondent or speaks with him, the IJ is no developing the record, and there is no proof that the record was given to or kept by the IJ here. Equally important, the IJ abdicated his statutory and regulatory duty to determine if the concession to removal was made intelligently and voluntarily. ("If the alien is unrepresented, the Immigration Judge must determine that the alien's waiver is voluntary, knowing and intelligent." 8 CFR section 1003.25(b)).

Not only is there no way to determine this without speaking to the Respondent, but the written documents, specifically **Exhibit 13** here, do not prove that Mr. Ramos assented to the provision that he was making the decision to be removed voluntarily and intelligently because he never signed, initialed or adopted that page in any way. There should be some record, transcript or prrof that Mr. Ramos accepted this document.  The best way to do that it to have the Immigration Judge review the documents and ensure the waivers and concessions are knowing, intelligent and voluntary, which the INA demands.

Nor is there any proof that the IJ had any factual basis before him nor did he speak with the Respondent to assure himself that there was indeed a factual basis for this "stipulation" to be removed. And there is not any proof that the IJ determined for himself there was a valid waiver of appeal.  Indeed, the waiver drafted by the Immigration Service, which is set forth in section 13 on the third page of **Exhibit 13** says in English: "I hereby waive appeal of the written order of removal."  In Spanish, right underneath, it says, "No desero apelar la orden escrita del Juez Immigraction."  There are no initials, signatures or any other indication that Mr. Ramos read this provision or that he adopted this provision.  There is not even a page

number.

Exhibit 13, when reviewed in its entirety, causes the reader to think that it is a prefabricated document, with notations and provisions already placed in the document, before the Respondent sees it, such as "Mexico" as the designated country of removal, and "x"s already typed in the document where the Immigration Service wants the Respondent to waive his or her rights, without any specific case number or adoption of the documents by the Respondent.

The forms are so basic that they do not even contain the particular factual bases for removal.  Instead, it just says, in section 6 "I admit that all of the factual allegations contained in the NTA are true and correct as written."  Here, we do not even know which charging document (which NTA) the Immigration Service is referencing, is it the NTA issued on May 9, 2006 or the NTA issued on May 11, 2006.  Clearly, no one reviewed this very important, vital part of what the government is presenting as a "valid," "intelligently entered into" stipulation of removal.

**G.    The Indictment should be dismissed because the government will be relying on unreliable evidence to prove an element of the crime, *i.e.*, a prior valid deportation which is an unlawful contract**

Exhibit 13, if believed, represents a documented that is vague in content and which is not adopted by Mr. Ramos, nor was it entered into with the advice and consent of legal counsel, or by the oversight of a judicial officer.  There is no real proof that Mr. Ramos actually entered into **this contract or that he did so voluntarily or knowingly or intelligently.**

Here, the statute and regulation authorize on their face a stipulation between the parties to a written order of removal by an

IJ.  A stipulation is a contract, a legal agreement, and thus it is susceptible to review on contract grounds.  *See generally*, Black's Law Dictionary, defining "Stipulation" as a material condition, requirement or article in an agreement, or "the name given to any agreement made by the attorneys engaged on opposite sides of a cause or a "*[v]oluntary agreement* between opposing counsel concerning disposition of some relevant point so as to obviate need for proof...(emphasis added).

The contract here, again, assuming it is a document adopted by Mr. Ramos, is a contract of adhesion.  The Court can view the contract and its terms and the Court can see that there was unfair dealing in its formation from the very start, in Avenal, in the Central part of California, where one Immigration Officer promised a hearing before an Immigration Judge and one day later, in Eloy, Arizona, right near the border and far from family, other officers came up with a boilerplate, unpaginated document, that is not initialed anywhere, we have not idea who signed it for the government and Mr. Ramos' signature, if taken as true, is only on the last page, the text of which suggests he is still awaiting his hearing and that the outcome had not yet been determined.  **This should not serve as evidence in a criminal trial**.

There was no equal bargaining power given Mr. Ramos had no counsel, no judicial referee, no knowledge of the law and no access to evidence. *See, generally,* Public Utilities No. 1 v. Snohomish Co., Wash., et al, 2008 U.S. Lexis 5266 (June 26, 2008).  As such, this was not a freely-negotiated contract.

Given that the INA requires a Respondent to waive counsel and to represent himself if he cannot afford counsel, without the

oversight of the Ij who is statutorily required to oversee the proceedings, it would seem that the Constitutional right to "fairness', as in the plea bargaining context, was not met here, or by any standard.  Cooper v.United States, 534 F.2d(fourth Cir. 1978)((constitutional right to fairness is wider in scope than that defined by contract law in plea bargaining context).

        The unfair dealing is further exemplified by the Immigration Service's failure to admit to Mr. Ramos or to the IJ that he had an approved visa application for Adjustment of Status and by the abrupt and fast manner in which the immigration officers prevented Mr. Ramos from ever having a chance to be heard in court with a judicial officer presiding.

        **Exhibit 13** is evidence of the lack of bargaining power that existed when the "contract" was formed.  The Immigration Service' manipulation of the process, the evidence and the statutes and regulations in this case amounted resulted in this shoddy document that is not the product of a fair, arms-length negotiation process. It is not a reasonable contract.  The procedure is unconscionable. Id. Lloyd Noland Found., Inc. V. Tenet Health Corp.,2008 LEXIS 10752(Where both parties to a contract are sophisticated business persons advised by counsel and the contract is the product of negotiations at arms length between the parties, we find no reason to automatically construe ambiguities in the contract against the drafter).

     Procedural unconscioability of a contract focuses on the manner in which the contract was negotiated and the relative circumstances or the parties.  O'Hare v. municipal Research Corp., 107 Cal. App. 4th 267 (2002).

        In Lloyd, the contract terms were upheld in large part because

1 the parties were "sophisticated" and "fully advised by counsel."

2      Here, obviously there is no equal bargaining power or equal

3 access to knowledge or evidence.  Thus, the ambiguity in **Exhibit 13**

4 must be read in Mr. Ramos' favor in that it was not adopted by him,

5 except, maybe, the last page, where the text could just as easily mean

6 he was still waiting to see an Immigration Judge *and* that the outcome

7 of his case was still to be determined.

8      Put another way, there is no valid consent by Mr. Ramos.

9 Actually, there is no consent at all, just a possible signature on one

10 page that says he may or may not be banished from the country and his

11 case had not yet been determined.  This fact, combined with the parole

12 evidence, such as the NTA's and bond forms, support the conclusion

13 that Mr. Ramos was contesting his deportation and expecting a hearing

14 as they kept telling him he could have.

15      In other words, had there been a hearing here, before an

16 Immigration Judge, who reviewed the record and spoke with Mr. Ramos

17 and whoever the other person was who may have signed it, it might

18 stand a chance of being upheld.  However, under the circumstances in

19 which these "stipulated removals" are brought about, where there is

20 not even a factual basis contained in the document, adopted by Mr.

21 Ramos or otherwise, no Court., including this one, should recognize

22 them as valid, much less let it serve as the basis for an element of a

23 crime in a jury trial.

24

25      **H.   <u>Crawford v. Washington</u> prohibits the use of these documents
       unless and until the declarants come forward to be cross-
26      examined and where the declarant is not named, the document
       should never be admitted into evidence as it is completely
27      unreliable**

28      As the Court knows the government typically tries to

introduce into evidence at least an Immigration Judge's Order of

Deportation and a Warrant of Deportation in its attempts to prove a

valid deportation in an Illegal Re-entry prosecution.  The government

cannot sustain its burden of proof of this element based on these

documents because their admission would violate the holding of

Crawford and simply because they are so unreliable, given their

condition on their face and given the procedure that appears to have

generated these documents and which are now being used in a criminal

trial where the government has not only the burden of proof, but its

burden is very high, beyond a reasonable doubt, to prove the elements

of the charge

         in other words, a conviction should not and cannot be

supported by testimonial documents that are unsworn and were never

subject to cross examination and which were generated in a procedure

where the declarant (the IJ) never even saw or heard from Mr. Ramos.

Assuming arguendo the documents fall into some hearsay objection,

Crawford prohibits their use and the are simply too unreliable anyway.

         The Supreme Court states:

                Where testimonial statements are involved, we do
         not think the Framers meant to leave the Sixth Amendment's
         protection to the vagaries of the rules of evidence, much
         less to amorphous notions of 'reliability' .... the Robert's
         test allows a jury to hear evidence, untested by the
         adversarial process, based on a mere judicial determination
         of reliability.  It thus replaces the constitutionally
         prescribed method of assessing reliability with a wholly
         foreign one.  In this respect, it is very different from
         exceptions to the Confrontation Clause that make no claim to
         be a surrogate means of assessing reliability.

         In other word, the Sixth Amendment "commands, not that

evidence be reliable, but that reliability be assessed in a particular

manner: by testing the in the crucible of cross-examination."

Crawford, 541 U.S. at 37.  Therefore, the government, if it wants to prove this "removal," must provide the declarants or the documents are inadmissible or the Indictment should be dismissed.

### III.

### ANY STATEMENTS MADE BY MR. RAMOS SHOULD BE SUPPRESSED

**A.    MR. RAMOS' STATEMENTS WERE INVOLUNTARY NOR WERE THEY MADE AFTER PROPER MIRANDA WARNINGS HAD BEEN GIVEN. AS SUCH, ALL OF HIS STATEMENTS AND THE EVIDENCE DERIVED FROM THEM MUST BE SUPPRESSED.**

Mr. Ramos respectfully asks this Court to suppress any and all statements he allegedly made to the Immigration Officers who arrested him and questioned him and any statements he made to any INS official who deported or removed him from the United States.  By their own reports, all of the officers failed to abide the rule of Miranda. Miranda warnings must precede custodial interrogation even if an arrest has not yet been made.  "[O]nce [the] agents have probable cause to believe that the person they are questioning committed an offense, and that person reasonably believes he is not free to leave, Miranda warnings should be administered. United States v. Troise, 796 F.2d 310, 314 (9th Cir. 1986). And see: United States v. Beraun-Panez, 812 F.2d 578 (9th Cir. 1987)(encounter in rural field under coercive circumstances).

**B.    Any statements made by Mr. Ramos during the deportation proceeding should be held inadmissible in these proceedings because they were made involuntarily and because they were not preceded by Miranda warnings**

The government bears the burden of proving that Mr. Ramos was lawfully deported, excluded or removed from the United States in

1  order to prosecute him under 8 USC section 1326.  To support its
2  allegations, the government may wish to have admitted any statements
3  Mr. Ramos may have made at a removal/deportation or exclusion
4  proceeding and during interrogation by immigration officers.  The
5  government should not be permitted to rely on such statements as they
6  were not taken after Mr. Ramos was administered proper <u>Miranda</u>
7  warnings, nor were they voluntary.

8      The Government would undoubtedly like to utilize statements made
9  by Mr. Ramos with regard to his nationality, citizenship and his
10 deportability.  With regard to statements made during his 1996
11 deportation hearing, the government will likely rely on <u>United States</u>
12 <u>v. Solano-Godines</u>, 120 F.3d 957, 961-962  (9th Cir. 1997), which held
13 that because Mr. Solano-Godines was not interrogated by the
14 Immigration Judge and because the Immigration Judge could not
15 anticipate that Mr. Solano-Godines might be prosecuted two years later
16 for illegal re-entry, there was no <u>Miranda</u> violation.

17     <u>Solano-Godines</u>, *supra*, however, leaves open the possibility that
18 in some circumstances an Immigration Judge's questioning will amount
19 to interrogation and certainly there is the possibility that the
20 Immigration Judge could anticipate that the Respondent's answers could
21 later be used in a prosecution for 8 USC section 1326.  In other
22 words, the caselaw suggests that there may be exceptions to <u>Solano-</u>
23 <u>Godines</u>:  ("[Solano] relies upon *United States v. Alderete-Deras*, 743
24 F.2d 645 (9th Cir. 1984).  In <u>Alderete-Deres</u>, we suggested that the
25 lack of a Miranda warning at a civil deportation hearing "might"
26 render statements made during that hearing inadmissble in a subsequent
27 criminal trial. *Id.* at 648").

28         Such was the case here.  Mr. Ramos  was undoubtedly in

1  custody when the Officer ShiJie Fang saw him in Avenal State Prison

2  and when other assorted, typically unnamed  Immigration officers took

3  his statements in Eloy, Srizona. Each and every officer would know he

4  could be prosecuted for illegal re-entry not only because it is their

5  job, but because they are in an immigration detention facility where

6  many people are detained while they are being deported after they ahve

7  served criminal sentences.

8        Thus, the Immigration Agents, officers and attorneys should

9  have read Mr. Ramos his <u>Miranda</u> rights before any questioning began

10 because he was in custody, because they knew his responses could

11 incriminate him and because he did not make a knowing, voluntary

12 decision to respond to her questioning.  Mr. Ramos was not given any

13 choice with regard to answering the immigration agents,' officers' or

14 attorneys' questions.  The only remedy is to suppress the statements.

15 <u>United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1046-1050 (9th Cir.

16 1990); <u>United States v. Solano-Godines</u>, 120 F.3d 957, 961-62; <u>United</u>

17 <u>States v. Alderete-Deras</u>, 743 F.2d 645, 648 (9th Cir. 1984).

18        Finally, Mr. Ramos moves to suppress any of his statements

19 he may have made to an Immigration Officer before his deportation

20 hearing while he was in Avenal, and during his deportation proceeding

21 and when he was arrested for this case, on grounds that the original

22 contact by the Immigration Service was involuntary and thus his

23 subsequent statements in his deportation proceedings and to the agents

24 who arrested him here in Southern California were tainted by the first

25 statements. *See generally*: <u>Oregon v. Elstad,</u> 470 U.S. 298, 318, 84

26 L.Ed. 2d 222, 105 S.Ct. 1285 (1985); <u>Brown v. Illinois</u>, 422 U.S. 590,

27 45 L.Ed. 2d 416, 95 S.Ct. 2254 (1975);  <u>United States v. Mata-Abundiz</u>,

28 717 F.2d 1277, 1280 (9th Cir. 1993).

1   **C. Because Mr. Ramos statements to immigration officers at**
    **his arrest were not preceded by Miranda warnings and because**
2   **they were involuntary, the statements and any evidence**
    **flowing from them should not be admitted**
3

4       At this time, it is not exactly clear what documents and

5   what other statements there are that the government intends to use

6   against Mr. Ramos.  Nevertheless, Mr. Ramos statements were made

7   involuntarily to all of the representatives of the Immigration Service

8   who questioned him, including the government Immigration officers and

9   government Immigration attorneys who interrogated him and extracted

10  statements and information from him.

11      Certainly when Mr. Ramos was found very close to the border,

12  in an uninhabited area with other people not too far from the Port of

13  Entry and near the border, the agents had probable cause to believe

14  this group of people had just crossed the border illegally to avoid

15  inspection.  Therefore, the statements answered by Mr. Ramos to the

16  officers should have been Mirandized.

17       Accordingly, any statements made by Mr. Ramos to the INS

18  should be suppressed as they were made in a custodial setting while he

19  was subject to interrogation without the benefit of <u>Miranda</u> warnings.

20  <u>United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043, 1047-1048 (9th Cir.

21  1989)(statements elicited from defendant by Border Patrol while he was

22  in police station amounted to custodial interrogation, not just

23  biographical data).  *See also*: <u>United States v. Mata-Abundiz</u>, 717 F.2d

24  1277 (9th Cir. 1983)("Mata was jailed on state firearms charges.  As

25  an INS criminal investigator with 23 years of investigative

26  experience, De Witt knew that evidence of alienage, coupled with the

27  evidence of firearms possession, could lead to federal prosecution

28  under 18 USC App. Section 1202.  He had reason to know that any

1 admission of alienage by Mata would be highly incriminating.").

2 *See generally*:  United States v. Mata-Abundiz, 717 F.2d 1277,

3 1279-1280 (9th Cir. 1983)(where investigating officer has reason to

4 suspect that question is likely to elicit an incriminating response,

5 there is interrogation and Miranda violation); United States v.

6 Henley, 984 F.2d 1040, 1042 (9th Cir. 1993).

7    **D.   All fruits should be suppressed**

8         Thus all of Mr. Ramos' statements and any evidence,

9 including his fingerprints, his criminal history, and his immigration

10 history, all of which stemmed from the unlawful violation, must be

11 suppressed.  Wong Sun v. United States, 371 U.S. 471 (1963).

12         In other words, since Mr. Ramos did not initially receive

13 any Miranda warnings, *all* statements he made to the agents, at all

14 times, should be suppressed, along with *all* of the other evidence

15 stemming from the unlawful encounter.   Only after they determined his

16 illegal status did the agents allegedly Mirandize Mr. Ramos.  This is

17 illegal under the United States Constitution and caselaw.  See: United

18 States v. Mata-Abundiz, 717 F.2d 1277, 1280 (9th Cir. 1993)(in-custody

19 questioning by INS investigators is equivalent to an interrogation and

20 must be preceded by Miranda warnings if the question is reasonably

21 likely to elicit incriminating response). *See also:*  United States v.

22 Solano-Godines, 120 F.3d 957, 961-62;  United States v. Gonzlaez-

23 Sandoval, 894 F.2d 1043, 1046-1050 (9th Cir. 1990); United States v.

24 Equihua-Juarez, 851 F.2d 1222, 1225 n. 7 (9th Cir. 1988); United

25 States v. Alderete-Deras, 743 F.2d 645 (9th Cir. 1984).

26    E.   **In addition to the Miranda violation, the statements
27         and evidence shold be suppressed because there is no
         evidence that Mr. Ramos willingly, voluntarily and
         knowingly spoke with immigration officer; instead, he
28         was forced to do so**

1

2       When interrogation continues without the presence of an

3   attorney, and a statement is taken, a heavy burden rests on the

4   government to demonstrate that the defendant intelligently and

5   voluntarily waived his privilege against self-incrimination and his

6   right to retained or appointed counsel. <u>Miranda</u>, 384 U.S. at 475.

7       There was no waiver in this case.  Mr. Ramos was

8   interrogated by various officers and agents.  All of his statements

9   must be suppressed.

10      It is undisputed that a waiver of the right to remain silent

11  and the right to counsel must be made knowingly, intelligently, and

12  voluntarily in order to be effective.  <u>Schneckloth v. Bustamonte</u>, 412

13  U.S. 218 (1973).  The standard of proof for a waiver of this

14  constitutional right is high.  <u>Miranda</u>, 384 U.S. at 475.  <u>See</u> <u>United</u>

15  <u>states v. Heldt</u>, 745 F.2d 1275, 1277 (9th Cir. 1984) (the burden on

16  the government is great, the court must indulge every reasonable

17  presumption against waiver of fundamental constitutional rights).

18      The validity of the waiver depends upon the particular facts

19  and circumstances surrounding the case, including the background,

20  experience, and conduct of the accused.  <u>Edwards v. Arizona</u>, 451 U.S.

21  477, 472 (1981); <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1983).  <u>See</u>

22  <u>also</u> <u>United States v. Heldt</u>, 745 F.2d at 1277; <u>United States v.</u>

23  <u>McCrary</u>, 643 F.2d 323, 328-29 (9th Cir. 1981). Here, Mr. Ramos was

24  always in the custody of immigration officers who never told him he

25  could refrain from speaking, and who failed to tell him pertinent

26  information and who prevented him from exercising his rights.

27      The standard for determining if a confession was voluntarily

28  given is whether "the confession is a product of an essentially free

                                    37                        O7CR3402IEG

1  and unconstrained choice by its maker." <u>Beecher v. Alabama</u>, 499 U.S.

2  279 (1991).  In determining whether a defendant's will was overborne

3  in a particular case, the totality of the circumstances must be

4  considered.  <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973).

5       Here, Mr. Ramos was in custody at all times when he was

6  interrogated by a variety of Immigration Officers in a variety of

7  different places, including the California Department of Corrections,

8  and with the Immigration and Naturalization Service and the Department

9  of Homeland Security.  The agents report are devoid of any mention of

10 a reading of <u>Miranda</u> rights yet Isaac Ramos was interrogated

11 everywhere, in Northern California various times by Immigration

12 Officers, in Arizona by more Immigration officers and the lawyers who

13 were bent on deporting him and by Border Patrol Officers in Southern

14 California. There is no issue of voluntary consent here.  Mr. Ramos

15 was given no choice but instead found himself subjected to the

16 unlawful interrogation and he was never interrogated.

17      Now, the government, knowing that he could be prosecuted,

18 may try to use his own words against him.  All of the government

19 agents, the government officers and the government attorneys knew and

20 advised Mr. Ramos he could be prosecuted for illegal re-entry. *See:*

21 Exhibit 13:

22      I understand that, depending upon the facts and
   circumstances of my case, I cannot return to the United States for a
23 minimum of ten years, and possibly, forever, without special
   permission from the Attorney General of the United States.  I also
24 understand that returning without proper permission could result in my
   being removed again and/or my prosecuted (sic) for illegal reentry
25 which may result in punishment for up to twenty years in prison.

26
        Therefore Mr. Ramos's words should not be used against him,
27 nor should any derivative evidence be used against him.
28

07CR3402IEG

1    The government may argue and rely on precedent indicating
2  that preliminary questions made to him in the field need not be
3  precipitated by <u>Miranda</u> warnings. However, Mr. Ramos would like to
4  preserve this issue on grounds that anyone, found so close to the
5  border, in a group of other people with no noticeable occupation or
6  reason for being in an area that has no businesses or homes or
7  facilities bear it, and who are deliberately chased and detained by
8  the Border Patrol, are more than likely undocumented people, traveling
9  through the countryside by the border line.  There was probable cause
10 to believe they were illegal, thus all responses from statements at
11 that time should be suppressed.

12   Moreover, evidence stemming from that seizure should not be
13 sued against Mr. Ramos, including fingerprints taken at the time, his
14 name and the information that was derived by the agents after they
15 determined his name and other biographical information.  The
16 government cannot argue with a straight face that "biographical
17 information" is not incriminating in an illegal re-entry prosecution.
18 Such information is vital for its case in chief,, proving the elements
19 of the crime.  Nor can the government argue that Mr. Ramos was not in
20 custody from the second he was seized on the ground, and while at the
21 Border Patrol offices. <u>Wong Sun v. United States</u>, 371 U.S. 471 (1962).

I**V.**

### **MR. RAMOS REQUESTS LEAVE TO FILE FURTHER MOTIONS**

25   Mr. Ramos anticipates filing *in limine* motions.  Accordingly
26 he asks this Court to allow him to file further motions.

**VI.**

O7CR3402IEG

V.

**CONCLUSION**

For the foregoing reasons, Mr. Ramos respectfully requests
that the Court grant his motions.


Dated:  July 16, 2008     Respectfully submitted,

                          /s/Joan Kerry Bader
                          JOAN KERRY BADER
                          Attorney for Defendan tRamos

O7CR3402IEG