JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California 92101-6128
Telephone: (619) 699-5995
FAX (619) 699-5996
Attorney for Defendant Ramos

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
THE HON. IRMA E. GONZALEZ

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | ) ) ) | CASE NO.07cr3402 |
| | ) ) | August 12, 2008 |
| v. | ) ) | 9:00 a.m. |
| | ) ) | DEFENDANT'S ADDITIONAL |
| ISAAC RAMOS, | ) | MOTIONS IN LIMINE, |
| Defendant | ) ) | MOTION TO SUPPRESS AND MOTION TO DISMISS |
| | ) | THE INDICTMENT |

TO:  KAREN HEWITT, UNITED STATES ATTORNEY;
     CHRISTOPHER ALEXANDER, ASSISTANT UNITED STATES ATTORNEY

     Defendant Isaac Ramos, by and through his attorney, J. Kerry Bader, hereby files the following additional *in limine* motions, and motions to dismiss the Indictment and motion to suppress..


Respectfully submitted,          /s/Joan Kerry Bader
                                 Joan Kerry Bader
                                 Attorney for Isaac Ramos
Dated: August 6, 2008

07CR3402

**I.**

**While it is not clear exactly which documents the Government anticipate using in its case in chief, Mr. Ramos objects to the admission of the government's documentary evidence as well as his statements and other evidence derived from his unlawful arrest**

**A.  Mr. Ramos objects to the admission of the government's documentary evidence, including A file documents, arrest reports and Mr. Ramos' statements based on the Fourth, Fifth and Sixth amendments and    Crawford v. Washington**

Mr. Ramos has objected to and continues to object to the Government's use of its documentary evidence stemming almost exclusively from it's a file throughout these proceedings  Specifically, he objected to the all of the A file documents and the law enforcement reports that were generated in this case.

Without these documents, the Government cannot prove that Mr. Ramos was deported or removed from the United States or that he was  an alien.

The defense objects to the documents because they all violate the Sixth Amendment's guarantee to confront witnesses, the Fifth Amendment's guarantee of Due Process and fair play, and because the deportation proceedings were not presented to the Grand Jury and because Mr. Ramos did not receive Miranda warnings before being interrogated by an Immigration Judge or any other law enforcement officer, which would include each and every immigration or Department of Homeland Security officer that encountered Mr. Ramos.  Crawford v. Washington, 541 U.S. 36 (2004); Shephard v. United States, 544 U.S. 13 (2005).  The evidence-based objections included lack of identity of declarant, lack of authenticity, lack of foundation, lack of reliability and most importantly under Crawford, the lack of the safeguard of prior cross examination, along with objections that the hearsay statements did not pass muster under any of the hearsay exceptions and Crawford does not permit these exceptions anyway.

Because the IJ's "order" is testimonial, and un-cross-examined hearsay it should not be admitted, nor should the statements of the Immigration Service [IS] officers and other Department of Homeland Security [DHS] officers.

07CR3402

The IS and DHS' statements, many of them leading and compound, complex questions, assuming they were actually posed to Mr. Ramos, and we have no idea if they really were, are uncross-examined hearsay.  Their words, supposedly asking him questions, without any foundation or indicia of evidence that he was really asked these questions about his alienage and ordering him deported, could convict  him in violation of Crawford, the Fifth and Sixth Amendments and the Federal Rules of Evidence.

The first point of contention though, is the fact that all of Mr. Ramos' statements to the IJ are being used against him in this criminal proceeding just months later in a 1326 prosecution does not comport with the requirements of Miranda v. Arizona, 384 U.S. 436, 444 (1966) and the requirement that the statements be made voluntarily.

Mr. Ramos was in custody when an order of deportation (removal) was issued in Eloy, Arizona.   He was not free to leave.  E government's discovery suggests he was asked incriminating questions the if answered would land him in jail, as it did in this case.  The discovery he was questioned by immigration officers in 2005 and 2006 and again when he was arrested on this cae in November 2007.  These same words are now being used to imprison him.  Each and every immigration officer who encountered Mr. Ramos and any IJ who may have overseen his case was well aware that Mr. Ramos could end up in a criminal prosecution for illegal reentry.  See, United States v. Solano-Godines, 120 F.3d 957, 961-61 (9th Cir. 1997).  Solano-Godines left open the possibility that if the IJ could anticipate that a respondent might be prosecuted, thus perhaps they should receive Miranda warnings in Immigration Court.

The same conclusion can be found in United States v. Alderete-Deres, 743 F.2d 645, 648 (9th Cir.1984), that a Miranda warning at a civil deportation might render statements made during the hearing inadmissible in a subsequent criminal trial.  Here, IS or DHS attorneys, assuming they really met with Mr. Ramos, knew that he could be prosecuted for illegal re-entry if he were found in the United States.  Their own "evidence" even suggests this as a possibility.  See, Exhibit which states that depending on his case, he might be removed and if he ever re-entered illegally he might face a

1  prison term.  Thus, knowing that any statements he might make could be used against

2  him in a criminal prosecution, the immigration officers should have preceded the

3  questions with proper <u>Miranda</u> warnings.  Therefore, his statements should not be used

4  against him in this trial.  The immigration officers and the iJs in Eloy, Arizona house

5  hundreds of defendants that have been criminally prosecuted in Southern California.

6  The government cannot hide behind a facade and say they did not know the statements

7  could be used against the defendant.  The government had a full opportunity to advise

8  Mr. Ramos and the hundreds of other detainees that the have <u>Miranda</u> rights, that they

9  have th option of remaining silent and that if they choose to speak, their works can and

10 will be used against them in any future prosecution.  The government forfeited its right

11 to use Mr. Ramos' words against him by refusing to administer a reading simple, yet

12 fundamental Constitutional warnings.

13      Furthermore, not only were Mr. Ramos' statements not preceded by <u>Miranda</u>

14 warnings his statements were clearly not voluntary.  The simply the result of being

15 forced to respond to the very agency and its lawyers and law enforcement officers who

16 knew his own words could be used to indict and imprison him and who did not bother to

17 advise him that he had a choice, to remain silent, and that if he chose to speak, he had a

18 right to know that his very words could be used to convict him, in contravention of his

19 Fifth amendment right to choose to remain silent.  Without the statements concerning

20 Mr. Ramos' alienage, he cannot be convicted.

21      Furthermore, Mr. Ramos  never adopted the IJ Order of Deportation.  Indeed, he

22 surely never even saw it,  so it certainly is not an admission.  .   Because the IJ was not

23 cross-examined, much less ever saw Mr. Ramos,  and because he will not be called by

24 the Government to testify as to her conclusion and how she arrived at it, and because the

25 Deportation Order was never adopted as an admission by the defendant nor is it a public

26 record, the document should never be admitted to the jury.

27      The Rules of Evidence do not excuse violations of the Confrontation Clause.

28 <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).  A deportation order is made up of

testimonial, hearsay statements by a declarant (the IJ) who was never cross examined. The words are testimonial: the Respondent was "ordered deported." These are incriminating words that are being used to convicted Mr. Tramos and yet he has never even seen the IJ much less had the opportunity to cross examine him under oath. ER 433. To say they are not testimonial is patently absurd: they are the exact words that establish the element of the crime.

The Court held in <u>Crawford v. Washington</u>, 124 S.Ct. 1354 (2004), that pursuant to the Sixth Amendment, pre-trial testimonial statements may not be admitted against a defendant at trial where the defendant has not had the opportunity to cross-examine the declarant. <u>Crawford</u>, 124 S.Ct. at 1374. This is true even where the statements fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." <u>Id.</u> at 1369, thus the IJ's statements cannot be saved by saying they are "trustworthy." ER 437, 438. Nor are they public records. It takes a court order or a Freedom of Information Act request to access these records.

The Confrontation Clause "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." <u>Id.</u> at 1370 (italics added). Thus, the Court held that where out-of-court "testimonial" evidence is at issue, the Sixth Amendment does not permit such evidence to be admitted against an accused, regardless of its reliability, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. Here, there is not a shred of reliability surrounding any of the DHS/IS-issued documents in the A file, and they certainly are not the result of cross-examined, sworn testimony.

There is no way for this Court to rely on hearsay exceptions to admit the statements within the A file documents.

The Supreme Court reasoned, after a lengthy discussion of the historical context of the Confrontation Clause, that the Sixth Amendment was drafted in order to protect against the "civil-law mode of criminal procedure" and "its use of *ex parte* examinations as evidence against the accused." <u>Crawford</u>, 124 S.Ct. at 1363. Such *ex parte*

07CR3402

examinations run afoul of Sixth Amendment concerns because they are "testimonial" in nature.  Id. at 1364.  The "text of the Confrontation Clause reflects this focus."  Id.  It applies to "witnesses against the accused - in other words, those who bear testimony."  Id. (internal quotations omitted).  The IJ and other immigration officers and attorneys, some of whose name we cannot even discern, are going to be used by the Government as an uncross-examined witness against Mr. Ramos.  Thus, the Sixth Amendment is concerned with "testimonial" statements.  Id.  "Various formulations of this core class of 'testimonial' statements exist:

> *ex parte* in-court testimony or its functional equivalent--that is, material such as affidavits, **custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially** . . . extrajudicial statements . . . contained in formalized testimonial materials, such as **affidavits**, depositions, prior testimony, or **confessions**.. statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."

Id. at 1364 (internal citations and quotations omitted, emphasis added).

Thus, the Confrontation Clause does not permit testimonial statements to be admitted at trial without the "constitutionally prescribed method of determining reliability," *i.e.*, confrontation in the form of cross-examination at trial.  Id. at 1374.

In this case, Mr. Ramos was never  given an opportunity to cross-examine the IJ whose statements ordered him deported to Mexico.   To admit these statements would amount to structural error.  Washington v. Recuenco, 126 S.Ct. 165 (2006).  In Recuenco, the defendant argued, among other things, that the Blakely error in his trial amounted to structural error and that harmless error was not applicable.  The Court declined to answer that question but did note that it has

> repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal.  Instead, 'most constitutional errors can be harmless.  *Neder v. United States*, 527 U.S. 1, 8 (1999)... 'If the defendant had counsel and was tried by an impartial

adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' 527 U.S. at 8... Only in rare cases has this Court held that an error is structural, and thus requires automatic reversal. n2.  In such cases, the error 'necessarily renders a criminal trail fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'..... <u>Id.</u> at 2552.

Here, Mr. Ramos had no counsel *on his side, which, even without the Confrontation Clause violation, is structural error.*  All he had was the legal counsel of his party-opponent, who has a clear interest and conflict in that those counselors, be they DHS or IS attorneys or law enforcement officers, who simply want to remove people from the country.  The IJ in this scenario seems conflicted as well.  What Judge would enter an order against someone he has never seen or heard from and who was uncounseled, uneducated, and who was given "legal advice" d by his party opponent?

The Supreme Court has stated there are a limited number of errors that

defy analysis by harmless error standards. *Arizona v. Fulimante*, 699 U.S. 279 [further citations omitted] (1991).  Errors of this type are so intrinsically harmful as to require automatic reversal (*i.e.*, effect substantial rights) without regard to their effect on the outcome .  For all other Constitutional errors, reviewing courts must apply [Rule] 52(a) harmless error analysis and must disregard errors that are harmless beyond a reasonable doubt. <u>Neder v. United States</u>, 527 U.S. 1, 24 (1999).

Trial errors which  require automatic reversal" include:  <u>Johnson v. United States</u>, 520 U.S. 461 (1997).  These include violations such as the complete denial of counsel (<u>Gideon v. Wainright</u>, 372 U.S. 335 (1963)); having a biased trial judge (<u>Tumey v. Ohio</u>, 273 U.S. 510 (1927)); racial discrimination in selection of a grand jury (<u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986)); denial of self-representation at trial (<u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984)); denial of a public trial (<u>Waller v. Georgia</u>, 467 U.S. 39 (1984)); and a defective reasonable doubt instruction (<u>Sullivan v. Louisiana</u>, 508 U.S. 275 (1993)).

Constitutional violations that defy harmless error review are those that contain a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Fulimante, supra*, at 30.  Such errors "infect the entire trial process." *Brecht v. Abrahamson*, 507 U.S. 619...(1993) and necessarily render a trial fundamentally unfair,"....<u>Id.</u> at 7-9.  Here, it is fundamentally unfair to use the A file documents against Mr. Ramos for several reasons.  One, there is no way to confirm that

Mr. Ramos made any of the few statements that are being attributed to him. That is a violation of th Fifth Amendments right to Due Process. Secondly, the A file documents violate the Sixth Amendment and Crawford's core guarantee of the most fundamental right to cross examine one's accusers. Third, the use of these statements violate the Fifth Amendment and the Fourth Amendment's guarantee of the right to remain silent and to not incriminate one's self and the right to make statements voluntarily, not against one's will.

Indeed, it is difficult to imagine a trial so unfair, such as one in which a defendant is not entitled, at anytime, anywhere in the process, much less the trial itself, to confront the evidence, testimony and witness that the Government is now trying to use against him.

Furthermore, the vagaries of determining the sufficiency of the evidence is really just replacing the Courts as the triers of fact, a point that was of particular concern to the Supreme Court in Crawford.

While violations of the Confrontation Clause have not previously made the list of fundamental errors requiring automatic reversal, it appears the Court has reconsidered its position, to put it mildly. In other words, a Confrontation Clause violation really is one of a defendant's "basic protections" that has been guaranteed for centuries, "without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence..." Id.

The language throughout Crawford all but says that the Court has concluded that a Confrontation Clause violation renders a criminal trial "fundamentally unfair," to the point where it Confrontation Clause violations now require automatic reversal.

In our jurisprudence, the phrase, "fundamentally unfair," is synonymous with structural error. *And see:* Neder v. United States, 527 U.S. 1 (1999).

In Subsection V of the Crawford decision, the Court adopts a proposal brought forth by members of the Court and academics that call for revisions of the Court's understanding of the Confrontation Clause, specifically, **"that we impose an absolute**

**bar to statements that are testimonial, absent a prior opportunity to cross-examine."** Id. (emphasis added). *An absolute bar sounds like what it says, i.e., no exceptions can excuse the erroneous admission of Confrontation Clause violations.*

Indeed the Court goes on to declare that "we do not think that the Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence, much less to amorphous notions of "reliability."....Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of the evidence... but that reliability [must] be assessed in a particular manner: by testing in the crucible of cross-examination." Id.

These statements in Crawford are saying several things. For one, there can be no more hearsay analysis to determine of a statement is admissible where the Confrontation Clause is violated. Second, a judge's determination of reliability, whether it be the District Court, the Appellate Court or the Supreme Court, cannot excuse a Confrontation Clause violation. Those are not necessarily reliable assessments. Reliability can only be determined by confrontation.

The Court has concluded: "[W]e decline to mine the record in search of indicia of reliability. Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Id. Accordingly, the statements that the government expects to rely on in this case, may not be used against Mr. Ramos to convict him.

The right is deemed so absolute, that the Court has said: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." Id. Such a vast declaration surely places a Confrontation Clause in the list of structural error violations that cannot be excused by "harmless error" analysis.

//

//

//

07CR3402

**B. Besides the Constitutional prohibitions, the documents are not admissible pursuant to any Federal Rule of Evidence**

Mr. Ramos' inability to cross examine the declarants who are the authors of the very documents [a Certificate of non-Existence of permission to reenter the United States, otherwise known as the  CNR, the Order of Deportation and the transcript of the hearing] used to convict him is structural error.  Federal Rule of Evidence Rule 803(8) would not serve as an exception to the hearsay rule because neither the IJ's Order of Deport nor a CNR nor the Warrant of Deport are matters of public record.   They are private documents held by the agency that only one person in the general public can access, the individual whom the A file identifies, and then, only through a Freedom of Information Act request [FOIA], that the agency can deny.  Not even a relative can obtain the file through a FOIA request.  Defense Attorneys routinely have to ask permission from the District Court, *as in this very case,*  to gain access to these files as well as the tape recordings of these hearings.  There was not even a recording of any removal proceedings here, much less a meeting between an Immigration Judge and Mr. Ramos.

Rule 901 of the Federal Rules of Evidence requires authenticity or identification prior to admission.  None of that was complied with here.  Nor was Rule 902(1) or (11) because none of these items are public record nor do any of them exhibit a seal or an identifiable, specific person, and they are not done in the course of "regularly conducted activity" as the Rule requires; rather, they are done on an erratic basis, only when a defendant opts to go to trial.  A CNR, for example, is only generated when a case is headed down the road to trial, and in fact, after this Court ordered the Government to produce the A file to the defense in this case, no CNR was in the A file.  Thus, a CNR, if produced by the government int his case, is not admissible because it is a law enforcement report generated in anticipation of trial.

The case at bar is similar to that in <u>United States v. Orrellano-Blanco</u>, 294 F.3d 1143 (9th Cir. 2002) where the defendant was indicted for marriage fraud and making

false statements to an immigration officer.  The Ninth Circuit said it was error to admit a

signed statement made by the Defendant to an immigration officer where there was no

proper foundation indicating the defendant had really signed the document,. Just as in

this case, in particular, with regard to Defense Exhibit 6, the alleged Stipulation to

Removal, as well as the Orders to Show Cause that Mr. Ramos may have signed.

       The Ninth Circuit specifically stated that the foundational requirements were not

met in Orellano-Blanco, because there as no admissible foundation adequate to

demonstrate that the defendant adopted the statements as his own,   There was

insufficient proof the signature was the defendant's, in part because of the language

barrier, and there was insufficient inferences that the document was actually read to the

defendant by the immigration officer or that he could read it or did read.  Furthermore,

there was no evidence the statement was a verbatim recording of the what the defendant

had said to the immigration officer.

       These are the exact same problems with Exhibit 6, the "Stipulation" to

deportation, as well as the other documents within the Afile.  There is no proof that Mr.

Ramos really signed the document, and no proof it was really read to him or that it was

read verbatim or that he understood what it said.  There is certainly no recording of the

proceeding.

       As in Gonzalez-Gonzalez v. INS, where the Ninth Circuit considered a signed

affidavit under similar circumstances, "the probative value of this document is severely

undermined by the circumstances of its execution."  Likewise here.  The government

wants to present a four-page document to say that Mr. Ramos agreed to be deported,

without any of these foundational requirements.  We have no idea who conducted the

translation or if it really occurred or if the document was really read to Mr. Ramos, or

even all four pages, or if he understood it.  There is no recording and there was no

judicial oversight or conference with Mr. Ramos to ensure it was really his stipulation.

Indeed, the document does not even have a legible name of a government representative

who supposedly signed it.  Also, the fact that it otherwise appears that Mr. Ramos

07CR3402

wanted to see an Immigration Judge and that he had been approved for a visa and there is

no evidence the officers told him this, indicate the untrustworthiness of this document.

All of these circumstances "severely undermine" the validity of this document. *See also*:

United States v. Monks, 974 F.2d 945, 950 (9th Cir. 1985): Before letting in evidence as

an adoptive admission, the district court must first find that sufficient foundational facts

have been introduced for the jury reasonably to conclude that the defendant did actually

hear, understand and accede to the statement.

Notably, the Ninth Circuit said it was *not* harmless error to introduce

Orrellano-Blanco's "signed" statement and vacated the conviction and  remanded the

case for a new trial. United States v. Orrellano-Blanco, 294 F.3d 1143 (9th Cir. 2002)

Furthermore, the documents do not meet the public records exception under

Federal Rule of Evidence, Rule 803(8) because they do not fit into the law enforcement

provision within that rule. United States v. Orrellano-Blanco,, supra, 294 F.3d 1143.

Really, the statement was made by law enforcement and there is no issue that the

immigration officer was a law enforcement agent as there are "numerous cases that INS

officers and agents are law enforcement personnel" and although the document was

executed by a person seeking immigration status by marriage, it was made at the scene of

the crime. Pp. 1150-1151.

The CNR is a document prepared by "law enforcement" personnel made in

preparation for trial which is strictly prohibited by FRE Rule 801(8)(B).  The same for

the other A file documents.  The ICE and DHS agents are      *law enforcement* officers,

and thus these documents cannot be properly admitted under FRE Rule 803(8)(B) which

prohibits such documents if they are "matters observed by police officers and other law

enforcement personnel."

The Order of Deportation is not admissible under FRE 801(6), Records of

Regularly Conducted Activity because it is not done in the regular course of activity and

it is only done for law enforcement purposes.  Rule 803(8)

1    Also, there was no qualified witness to testify as to  the document, and because

2    there is not proper "custodian," either.   Just because a A file is mailed to a San Diego

3    ICE officer does not mean he or she is the proper custodian.  The custodian is the

4    director of records from where the A file was housed and where all the documents have

5    been gathered for the past 20 to 25 years that Mr. Ramos has been in the United States..

6    Nor will there be or can there be any testimony that Deportation Order was

7    accurate or based on sound legal analysis or conclusions.  The Rule requires that if the

8    document may not be admitted if the "circumstances of preparation indicate lack of

9    trustworthiness."   Here, the IJ nnever spoke to Mr. Ramos nor did the IJ follow the rules

10   and statutes that require him to do so before ordering one deported.

11   A local ICE agent or DHS agent from the Prosecutions Unit in the United States

12   Attorney's office in San Diego, is not a an expert in immigration law and thus he cannot

13   make the conclusion that the deportation order was legally valid, or are any of the A file

14   documents, for that matter. FRE Rule 702.  Furthermore, as a lay witness he cannot offer

15   an opinion or testify about specialized knowledge. <u>United States v. Figueroa-Lopez</u>, 125

16   F.3d 1241, 1245 (9th Cir. 1997).

17   Because the immigration process and the significance of immigration documents

18   derives from specialized knowledge, a person may testify about the immigration process

19   only if he qualifies as an expert to do so.  Although the government may call what it calls

20   a "custodian" of the A file, he or she must be proven to an expert in the immigration

21   process or the significance of immigration documents.  For example, has this person

22   appeared in deportation hearings or does he or she know all the bases and defenses to

23   removal or deportation.  There was no testimony he had ever studied the laws of

24   immigration, administrative or civil procedure or the rules of evidence, which, even then,

25   would not necessarily qualify him as an expert. Fed. R. Crim. Proc., 16 Rule; Federal

26   Rules of Evidence, Rules 710-703.

27                                                      **II.**

28   **Mr. Ramos Moves This Court to Dismiss the Indictment or to Suppress all**
     **Evidence Because Mr. Ramos was not Lawfully Arrested.**

1

2    Mr. Ramos' arrest was illegal, therefore, the indictment should be dismissed, or in

3    the alternative, all evidence derived from the arrest should be deemed inadmissible,

4    including, but not limited to, Mr. Ramos statements (although it does not appear that he

5    made statements), his personal effects and belongings and his fingerprints and his rap

6    sheet or criminal history.

7    Specifically, the arrest is unlawful because the agents had probable cause to

8    believe the group of people they arrested were illegally within the United States.

9    Assuming this, they needed to Mirandize Mr. Ramos prior to questioning him about his

10    identity and his alienage and nationality, all of which is relevant, incriminating

11    information.  Furthermore, this scenario was coercive.  There is no indication that Mr.

12    Ramos' statements to the Border Patrol agents were voluntary.  Because they failed to

13    Mirandize Mr. Ramos, the arrest was illegal the Indictment should be dismissed or in the

14    alternative, all the evidence should be suppressed. <u>Wong Sun v. United States</u>, 371 F.2d

15    471 (1963).

16    The Court has indicated it believes that fingerprints are not fruit of a poisonous

17    tree, and that such information would be produced inevitably.  However, the defense

18    disagrees and notes that fingerprint evidence is physical evidence of one's identity,

19    which is a critical foundational fact that the government must prove in order to establish

20    Mr. Ramos' identity and to establish that he is the same person they are claiming was in

21    removal proceedings at an earlier time.  This i s not merely booking information and thus

22    it is relevant fruit of the unlawful arrest.  The agents could have gotten a search warrant

23    before taking Mr. Ramos' fingerprints. <u>Johnson v. United States</u>, 333 U.S. 10

24    (1948)(warrantless search and arrest of opium smoker in her hotel room violated the

25    Fourth Amendment, even though the officers may have had probable cause to obtain a

26    search warrant and the inconvenience of and slight delay in preparing papers and

27    presenting evidence to a magistrate does not justify bypassing the warrant requirement..

28

**III.**

07CR3402

**Mr. Ramos Respectfully objects to the admission of any of his prior alleged convictions into evidence under any rule, and in particular, Federal Rules of Evidence, Rules 404b and 609.**

The government has not indicated that it wishes to enter into evidence any of Mr. Ramos' alleged prior convictions under either Federal Rule of Evidence 404b or Rule 609. Assuming the government moves to do so, Mr. Ramos objects to such evidence as it is highly irrelevant and highly prejudicial. There is no showing that any of Mr. Ramos' alleged prior convictions are in any way relevant to the charge of Illegal Reentry. Furthermore, their inclusion would simply cause the jury to conclude, without any evidence, that a criminal record would naturally have caused Mr. Ramos to have been deported before. This conclusion would prevent the government from having to prove its case with relevant evidence, and to prove it beyond a reasonable doubt. The danger is that the jury will simply convict because of alleged prior bad acts or convictions.

**IV.**
**This Court Should Dismiss the 1326 Charge Because Mr. Ramos' Underlying Deportation Was Invalid**

**A.    Standard of Review.**

Title 8 U.S.C. § 1326 prohibits any alien from entering or being in the United States after he has "been denied admission, excluded, deported or removed." 8 U.S.C. § 1326.

Within this Circuit, where the removal proceedings against Mr. Ramos took place, which is one of the elements of the crime of Illegal Reentry, "the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation." United States v. Arrieta, 224 F.3d 1076, 1079 (9th Cir. 2000), quoting United States v. Zarate-Martinez, 133 F.3d 1194, 1197 (9th Cir. 1998). Mr. Ramos was entitled to all the procedural protections afforded by the Constitution to one who is facing permanent removal from the country by the immigration authorities.

There is no issue that Mr. Ramos ever validly waived the right to appeal the removal order. United States v. Estrada-Torres, 179 F.3d 776, 780-81 (9th Cir. 1999). In order for

the waiver to be valid, it must have been "*considered and intelligent* ." <u>United States v.</u>
<u>Mendoza-Lopez</u>, 481 U.S. 828 (1987). (Italics added).

Here, the IJ never spoke or conferred with Mr. Ramos, much less advised Mr. Ramos
of any avenues of relief.  The IJ could have advised him that he was able to waive removal
based on 8 USC section 1182(h), commonly known as a "212h waiver" along with his
application to adjust his status under section 245a of the Immigration and Nationality Act
[INA] *which was found by the defense in the government's A file and which was approved*
*by the United States*.

This is of particular importance because Mr. Ramos hasd three United States children
who had lived all their lives here in the United States.  Equally important,  wife, to whom
he has been married since 1990 and who is the mother of all three of his children, is a United
States citizen.

 Here, a number of due process violations occurred that rendered any government
conclusion that Mr. Ramos validly waived his right to appeal as wrong..

**B.    Mr. Ramos' Due Process Rights Were Violated in Additional Ways that Render**
**the Removal Order Invalid**

**1.  Mr. Ramos  was not given proper notice of his deportation  hearing** , **a fact**
**that was never presented to the Immigration Judge**

Mr. Ramos was not given legally proper notice of his May 12, 2006 deportation
hearing.  The removal order should thus be vacated because it was constitutionally flawed
in procedure and substance.

For one, there is no proof that Mr. Ramos was given actual, comprehensible  notice
of his impending hearing or that he read it or that he had it read to him in any language.
here is no signature from Mr. Ramos indicating he read, much less understood the two OSCs
that have been produced in this case nor are there any of his signatures on any of the three
pages that make up the OSC.   There is one signature that shows that Mr. Ramos *wanted to*
*see an Immigration Judge*, in other words, that he asked to see an Immigration Judge, as was
his right, but he was prevented from doing so by DHS/IS officer.s  Just because Mr. Ramos'

signature appears to be on one page of a document does not mean that he received notice or in any way adopted the other pages that comprised an Order to Show Cause.

The fact that an officer may write that respondent read the document in no way confirms that he understood it or was advised of his rights. Indeed, this officer's signature, without anything from Mr. Ramos, suggests the IJ. The "x" typed onto the documents next to a signature line suggest that the Immigration officers wanted Mr. Ramos to waive his right to a hearing before an immigration judge and that they placed those "x"s on the forms before they even met with him.

If he even read the OSC, was misled into concluding that Mr. Ramos was given proper, meaningful notice of the reasons why he was being placed in removal proceedings, or his rights, which, if he had any meaningful amount of time to think about it, he might exercise, by contacting a lawyer, a counselor or his family. If he had been apprised of the OSC, why did he not adopt the document with his signature or initials as was the legal practice?

In fact, the exhibits suggest that Mr. Ramos was led to believe that he would see an IJ, but he never was brought to one. In fact, within two days, between Bakersfield, California and Eloy, Arizona, he was ordered banished from the country by an IJ he asked to see, but never did.

*Assuming arguendo* there was one iota of evidence that Mr. Ramos received notice that he would be going onto a removal hearing, the notice is fatal because it utterly fails to advise that the Respondent he may have a defense to the allegations, for example, in this case, a "212h" defense. This is of grave importance because the bulk of all respondents do not have counsel to advise them of potential defenses or alternatives to deportation.

Furthermore, the OSC does not advise the reader that he or she may be banished permanently from the country or that the responses he or she makes to deportation officers or the judge can later be used against that person in a serious criminal prosecution. Neither do the DHS documents, for that matter.

07CR3402

The OSC virtually assures the consent of the deportation by the respondent by providing a section that permits the respondent to request the quickest deportation possible, within a 14-day period. There is no admonition advising the respondent that he can take that same amount of time, or more, to get advice from his or her family. The notice is flawed because it does not allow a person to defend against deportation; instead, it causes rapid, if not immediate, acquiescence.

INA section 242b, also known as 8 USC section 1252b(1994), codifies the requirements of a proper Order to Show Cause. The statute is written to ensure Due Process rights of those facing deportation. Section 1252b(a)(1) provides:

1. The OSC is to alert the alien to the nature of the charges against him;

2. To set forth the legal authority under which the proceedings are conducted;

3. The conduct that is alleged to have been violated;

4. The charges against the alien and the statutes alleged to have been violated;

5. The alien may obtain his own counsel and is to be provided with a list of attorneys;

6. The alien is to provide the INS with an immediate contact number and address.

Section 1252b(a)(2) outlines the notice the requirements which essentially are to provide the alien with written notice by personal service regarding the time, place and consequences of the hearing.

Section 1252b(b) is subtitled securement of counsel and it states that an alien should be permitted the opportunity to secure counsel before the first hearing date and the hearing date shall not be scheduled earlier than 14 days after the service of the OSC.

Here, the OSC issued in Eloy, Arizona has one allegation, that Mr. Ramos had entered the country without inspection by an Immigration Officer, which is not a very serious charge, and can be defended. Thus, compared to the allegations in the OSC issued in Bakersfield, Mr. Ramos was led to believe, once he got to Eloy, that serious charges had been dropped and that he was still going to see an IJ and he signed *explicitly stating he wanted to see an IJ*.

07CR3402

Furthermore, in terms of consequences the OSC says nothing in reality as to how the respondent will banished forever if he or she does not discern and develop any possible defenses to deportation.  As will be shown below, Mr. Ramos could have benefitted from having counsel.

Mr. Ramos could have had applied for 212h relief.  He had been in the United States well over ten years.  He was married to a United States citizen and the father of three United States citizens who have never lived in Mexico.  The break up of the family unit in and of itself is grounds for extraordinary hardship if one is deported and is seeking a 212h waiver.

**2. The IJ never advised Mr. Ramos of his right to possible relief from removal under sections 212h and 245 of the INA**

In terms of the actual deportation hearing, the IJ never once spoke of any possible defenses, such as a "212h" defense, which required 10 years residence in the United States by the respondent, along with extreme hardship to a U.S. citizen or Lawful Permanent Resident parent, spouse or child if the respondent were deported.8 USC section 1182h.

Here it appears the Immigration Officers knew that Mr. Ramos was married to a United States citizen, that he had been approved for a visa and that he had three U.S. citizen children but they never even broached the issue of the damage to them or his U.S. citizen wife that would be done by his deportation from the country.  This not only was an extreme violation of Mr. Ramos' due process rights, but the prejudice that ensued was horrific in that he was permanently barred from the U.S.

The IJ was obligated to advise Mr. Ramos he had a possible defense to deportation (212h) and he was supposed to look at clearly enumerated factors that the BIA and this Circuit have spelled out in terms of the extreme hardship analysis.  However, the IJ did not even see Mr. Ramos much less speak to him.

The IJ abdicated his duties.  There is a plethora of factors that the Ninth Circuit and the Board of Immigration Appeals have held are of paramount importance in a 212h defense.  Extreme hardship has been construed to include a multitude of factors.  "The

07CR3402

existence of family ties in the United States is the most important factor in determining hardship." United States v. Arrieta, *supra*, at 1082, citing Gutierrez-Centeno v. INS, 99 F.3d 1529 (9th Cir. 1996).    Economic loss combined with relocating difficulties do not alone constitute hardship.  Something more is required to remove the case from the "typical" hardship. Id. at 1082.  Family separation, emotional and non-economic support factors are considered. Id.

Factors include the age of the Respondent, at the time of his initial entry, and his age at the time of his deportation; family ties abroad and within the United States; length of residence in the United States over the minimum requirement; the Respondent's health; political and economic conditions in their native country; the impact of their departure from the United States; their involvement in their community; and their immigration history. Ramirez-Alejandre v. Ashcroft, 320 F.3d 858, 876 (9th Cir. 2003).

Most important, the Ninth Circuit has held that "preservation of the family unit" may be the central factor in the "extreme hardship" determination. Jara-Navarette v. INS, 813 F.2d 1340 (9th Cir. 1986).

> [1]
> This Court has held that "[p]reservation of the family unit" may be a central factor in the "extreme hardship" determination. "Other circuits are also vigilant in ensuring that the BIA gives careful and individualized consideration to United States citizen children. Jara-Navarrete v. INS, 813 F.2d 1340 (9th Cir. 1986).
> This Court has concluded further:
> Under section 244(a), economic loss alone does not establish extreme hardship, but it is still a fact to consider in determining eligibility for suspension of deportation. Jong Shik Choe v. INS, 597 F.2d 168, 170 (9th Cir. 1970); Urbano de Malauan v. INS, 577 F.2d 589, 594 (9th Cir. 1978).

---

[1]

The factors to be considered under the "extreme hardship" standard are similar when determining whether or not relief from deportation is warranted under section 212(h) of the INA and section 244(a)(1), which is commonly known as Suspension of Deportation where on can defend against deportation by showing seven years residency in the United States, good moral character and extreme hardship to a resident or citizen, spouse, parent or child.  This Court has stated, "...we agree that the section 244(a)(1) cases are helpful in determining what constitutes "extreme hardship" for purposes of section 212(h)." Hassan v. INS, 927 F.2d 465 (1991).

All important factors must be considered in the hardship determination. "Denial of relief is arbitrary if important factors relevant to the hardship determination are not considered; the Board, therefore, must state its reasons for denying relief showing it has properly considered all factors. *Mejia-Carillo v. INS.*." Contreras-Buenfil v. INS, 712 F.2d 401 (9th Cir. 1983). Here, the District Court clearly erred.

Moreover, "[r]elevant factors, though not extreme in themselves, must be considered in the aggregate in determining whether extreme hardship exists." In re Ige, 20 I & N 880, 882 BIA 1994)

[T]he Board *must consider personal and emotional hardships which result from deportation*. Chan v. INS, 610 F.2d at 655. Included among these are the personal hardships which flow naturally from an economic loss decreased health care, educational opportunities and general material welfare. The most important single factor may be the separation of the alien from family living in the United States. *In fact this Court has stated that separation from family alone may establish extreme hardship.* Urbano de Malaluan v. INS, 577 F.2d at 593-94; Yong v. INS, 459 F.2d 1004, 1005 (9th Cir. 1972); *see* Bastidias v. INS, 609 F.2d 101, 104-05 (3rd Cir. 1979). Meija-Carrillo v. INS, 656 F.2d 520 (9th Cir. 1980). Id. *And see:* Cerrillo-Perez v. INS, 809 F.2d 1419 (9th Cir.). Italics added. Also, if the alien is required to prove he is not removable, the INS must under the Due Process Clause, provide him with evidence favorable to his defense. He was denied this opportunity because he was not told of 212h relief or of the factors that an IJ must consider,

Thus, Mr. Ramos was not given a "meaningful opportunity to be heard." Title 8, section 1229a).

By 2006, Mr. Ramos had been in the United State for half his life, twenty years. He was married lawfully to a United States citizen, a marriage that had come into existence in 1990, 16 years before. He and his wife used lawful channels to change his immigration status.

Mr. Ramos was very close to his children and the damage to them is obvious – any child who is separated from his parent will suffer emotional and psychological

1   consequences, along with the other issues that arise, for example, the economic hardship and

2   the resulting single-parent raising the children, the scholastic and emotional disruption of

3   their lives given that their father lives in another country.

4        Mr. Ramos could have sought relief had he been apprised of his rights his charges and

5   his potential defense but he was prevented from doing so because that he was in rapid transit

6   between state and federal custody and whisked into removal proceedings within two days

7   during which time he traveled hundreds of miles from Central California to Arizona. INS

8   v. Doherty, 502 U.S. 314, 324, 327 ((1992); Patel v. INS, 741 F.2d 1134, 1137 (9 [th] Cir.

9   1984).

10       The impact of deportation on a child is given significant weight.  The impact on the

11  child which would result from Mr. Ramos' banishment from the country is enormous.  This

12  Court well knows that the BIA grants significant weight to whether the health and well-

13  being of a child would be affected adversely by deportation, especially if such child is a

14  United States citizen.  The child's language skills, educational and medical needs, ties to the

15  community, ability to adapt to a foreign country and impact on life and employment

16  opportunities and income loss as a result of the deportation are also considered.  Ramirez-

17  Alejandre v. Ashcroft, supra at p. 876 - 878, citing In re Kao, 23 I & N. Dec. 45 (BIA 2001).

18   All of these factors if brought forth by Mr. Ramos would show extreme hardship on his

19  U.S. citizen family.

20       Furthermore, there is no way Mr. Ramos' children son would have flourished in

21  Mexico with just their  father who, as a single father, would have struggled to raise his

22  children, educate them, and make sure they receive proper medical attention,  and work at

23  the same time.  This assumes that  his wife  would have permitted him to take his children

24  out of the country or that they would have wanted to move from their home country to a

25  foreign one or that it would be easy for them to do so, scholastically, linguistically,

26  emotionally and psychologically.

27       Either way it is certain that the three children would be and indeed are harmed by the

28  exile of their father, either by being separated from their mother and living in a foreign land

without a support network, or by losing their father.  In Cerrillo-Perez, 809 F.2d 1419, 1425 (9th Cir 1987), this Court spoke approvingly of the Third Circuit which vacated the BIA's ruling that the failure of the BIA to adequately consider the separation of the father from his citizen son was an abuse of discretion."

The extraordinary problems for children without their fathers, who cannot even be in the same country with him, much less the same neighborhood, goes without saying. Notably, this is not a case where the children have been raised by people other than Mr. Ramos, which would militate against a finding of extreme hardship, as in Amezquita-Soto v. INS, 708 F.2d 898 (3rd Cir. 1983) where the U.S. citizen child had been raised entirely by her grandmother, and not by the respondent. Cerrillo-Perez, 809 F.2d 1419, 1425 (9th Cir. 1987).

In Meija-Carrillo, this Court reversed and remanded the BIA because the BIA failed to consider factors including the respondents imminent loss of employment due to her deportation, separation from her relatives in the United States and her Permanent Resident son's "worst of situations" who would be separated from one of his parents, depending upon whom he decided to live with, his deported Mexican mother or his Resident Alien father in the United States. Id. at 522-23.

Here, it is plausible that had the Immigration Judge or the BIA reviewed the case, these factors would have and should have been taken into account.  And, it is clear that such hardship would have resulted in this case as we examine the facts of Mr. Ramos' wife and children, all of whom were and still are in the United States. United States v. Arrieta, 224 F.3d 1076 (9th Cir. 2000).

"The  movant ... need not conclusively establish that he warrants relief." Ordonez v. INS, 345 F.3d 777, 785 (9th Cir. 2003).

**3.  The IJ violated Mr. Ramos' rights by failing to fulfill his multiple roles as impartial adjudicator and legal advisor**

In In re Michel, *supra*, at 1104-1105, the Respondent was convicted of burglary and grand theft for which he was given a sentence of two years.  The IJ deemed them aggravated

1  felonies and ordered him deported.  The BIA reversed noting that despite the aggravated

2  felony convictions, Michel was possibly eligible for a 212h waiver and Adjustment of

3  Status[2].

4          The same for Mr. Ramos  He had already entered into Adjustment of Status

5  proceedings and he had been approved by the INS for a visa, and. Like Michel, he could

6  plausibly have received a 212h waiver as shown above.

7          Given that between 1989 and 1995 alone, over 10,000 people with *aggravated*

8  felonies on their records were given 212c waivers, it is not likely that Mr. Ramos' criminal

9  history would have prevented him from obtaining a 212h waiver. St. Cyr v. INS, 533 U.S.

10  289 , 295-96 (2001).

11      As the Court well knows, federal regulations specifically require the IJs to advise the

12  alien of his or her possibility to adjust her status, and any other form of relief under the INA.

13  The IJ in this case was a non-entity.

14      Essentially, the IJ whose responsibility it is to advise a respondent of any type of

15  plausible relief, failed.  As Mr. Ramos was too indigent to obtain counsel, the IJ, by virtue

16  of the statutes and regulations that require him to advise a respondent, committed ineffective

17  assistance of counsel, or something akin to that Constitutional deprivation.  Whether or not

18  the Court agrees that the IJ must act as counsel for respondents in certain situations, all

19  respondents are still entitled to Due Process and Fundamental Fairness. *See*: Lara-Torres v.

20  Ashcroft, 383 F.3d 968, 972 (9 [th] Cir. 2004), *amended by* 404 F.3d 1105 (2005)""[T]he

21  extent to which aliens are entitled to effective assistance of counsel during [immigration]

22  proceedings is governed by the Fifth Amendment due process right to a fair

23  hearing.")(emphasis omitted).   *And see*: Ortiz v. INS, 179 F.3d 1148, 1153 (9th Cir.

24  1999)("ineffective assistance of counsel in a deportation proceeding was so fundamentally

25

26

27  [2]Under section 245a, an alien can adjust status if he has been inspected, admitted or
paroled into the U.S. if the alien applies for adjustment, the alien is eligible to receive an
immigrant visa and is admissible to the U.S. for permanent residence and a visa is
28  immediately available.  Mr. Ramos' visa was already approved by the INS, though there is
no proof anywhere that Mr. Ramos knew this or that the officers told him this.

unfair that the alien was prevented from reasonably presenting his case.").  Certainly this is what happened to Mr. Ramos.

For this reason alone, the Indictment against Mr. Ramos should have been dismissed.

## V.

## CONCLUSION

For the reasons set forth above, Mr. Ramos respectfully asks this Court to grant his motions.

Respectfully submitted,

DATED: August 6, 2008          /s/Joan Kerry Bader

Joan Kerry Bader