```
JOAN KERRY BADER
California State Bar No. 172586
964 Fifth Avenue, Suite 214
San Diego, California  92101-6128
Telephone:  (619) 699-5995
FAX (619) 699-5996
Attorney for Defendant Ramos
```

THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA
THE HON. IRMA E. GONZALEZ

| | |
|---|---|
| THE UNITED STATES OF AMERICA ) <br> ) <br> v.                             ) <br> ) <br> ) <br> ISAAC RAMOS,                   ) <br>          Defendant            ) <br> ) <br> _____) | CASE NO.07cr3402IEG <br><br> August 20, 2008 <br> 10:00 a.m. <br><br> SUPPLEMENTAL BRIEFING <br> IN SUPPORT OF DEFENDANT'S <br> MOTION TO SUPPRESS |

TO: KAREN HEWITT, UNITED STATES ATTORNEY;
    ERIC BESTE, ASSISTANT UNITED STATES ATTORNEY

   Defendant Isaac Ramos, by and through his attorney, J. Kerry Bader, has served this and the government with his supplemental points and authority in support of his motion to suppress on this day.

Respectfully submitted,          /s/Joan Kerry Bader
                                 Joan Kerry Bader
                                 Attorney for Isaac Ramos

Dated: August 19, 2008

**I.**
**THE BORDER PATROL AGENT'S CONCERN FOR OFFICER SAFETY HAS NO BEARING ON THE ISSUE OF PROBABLE CAUSE OR THE NEED TO ADMINISTER MIRANDA WARNINGS**

At the original evidentiary hearing held in this case, on or about August 12, 2008, the Court found that there was no probable cause to believe a crime had been committed and thus there was no need for the Border Patrol Agents to administer <u>Miranda</u> warnings prior to asking the six aliens incriminating questions about their alienage, their nationality, their place of birth and their parents' citizenship.  Transcript of Evidentiary Hearing of August 12, 2008, hereinafter "Transcript."Pp. 21-23, 53.

The Court, as set forth in the transcript of the evidentiary hearing, on pages, stated that the agents had to the right to seat the six people on the ground for officer safety. P. 64.

**A.   The Border Patrol Agents had Probable Cause to Believe that a Crime of Illegal Entry Was Being Committed**

Agent Nye knew testified that he believed that the six aliens were in the United States illegally.  It is a crime to enter the United States without inspection by an Immigration Officer and/or to evade inspection by circumventing the American Ports of Entry. *See:* United States Code, Tile 8, section 1325.

Without a doubt, Agent Nye knew or had probable cause to believe these six people had committed this crime.  Agent Nye was asked on cross-examination:

"And so based on what you knew about the location this area and based on your contacts with Agent Cortez (the infrared scope operator), you assumed these people were illegal.  Is that correct?"

**Agent Nye: Yes, that is correct. Transcript, p47. He also testified that** it was his duty to apprehend illegal aliens. He also testified he knows that it is a crime for somebody to come into the country without being inspected by an Immigration Officer or at a Border Patrol crossing point. Transcript, p. 47.

In addition, Agent Nye testified he did not believe they were field workers or employees and he testified the area where he was instructed to find the aliens by the Infrared Scope Operator was desolate and devoid of homes, businesses or farms. He testified they were traveling on a trail off a mountain that is well known for "illegal aliens to use to further their entrance into the United States." **Transcript, page 30-31.**

**B.   A Seizure Occurred**

Agent Nye and his fellow agents had to ferret out the six individuals, another obvious indicia that they were trying to evade the agents' inspection. Moreover, this is evidence that a seizure had occurred. Agent Nye specifically testified when asked if any of the aliens had tried to walk away that he would not have let them go. Transcript, pp. 48-49. He also stated their were three agents all together and then another and there were at least three marked Border Patrol vehicles as well as a German Shepherd that was used to find at least one alien. The dog is used to find illegal substances or illegal aliens. Transcript pp. 40 –54.

Mr. Ramos testified that he saw the dog being used to lunge at aliens to get them out of hiding. Agent Nye said they were armed with an H & K P2000, uniformed and had an array of weapons, including a bully club, their firearms, mace and in his case at least, a knife. They were uniformed and identified themselves as Border Patrol agents

1 as soon as they made contact with the people.  Mr. Ramos testified one
2 agent had pointed a weapon at them.  When asked by the Court, Agent
3 Nye testified he spoke to the aliens in an "authoritative" tone of
4 voice. Transcript. Pp. 32-33, 40-51

5 Agent Nye the aliens are forced to sit on the ground and they are
6 handcuffed and then they are not only asked incriminating questions
7 about their alienage and that of their parents, but they are asked to
8 sign a statement saying they wish to return to Mexico.  Agent Nye said
9 the seating on the ground and handcuffing are done for officer safety.
10 He also testified he searched everybody and their backpacks, their
11 "bodies" and their "pockets." Transcript, pp. 21-22, 23, 48-49, 52-55.

12 This scenario alone depicts an arrest, not just a seizure.
13 Nevertheless, Mr. Ramos' testimony substantiates this finding when he
14 specifically testimony when he stated that they could not have bene
15 apprehended if force were not used. Transcript 57.

16 He then said one officer pointed a gun at them and another used a
17 rag or a sponge to lure the German Shepherd into lunging at another
18 person to lure him out of a hiding spot.  He said the officer would
19 throw the sponge at the person and as the dog lunged at the person,
20 the officer would pull the dog back, to scare the person.  He
21 testified that he was lying on the trunk of a tree and that the
22 officer pointing the gun at him told him to get out of there so he
23 threw himself onto the ground.  He said if he tried to run away he
24 thought the officer would shoot at him. Transcript, pp. 68-72, 77-78.

25 The Court concluded, based on the agent's testimony alone, that
26 this was an arrest, and that Mr. Ramos' testimony about the dog
27 confirmed it for the Court. Transcript, p. 73, 80.

28

**C.   This was an illegal arrest and as such, the fruits of the government's illegal conduct may not be sued against Mr. Ramos**

In Kaupp v. United States, 538 U.S. 626 (2003), the Supreme Court reversed a murder conviction and sentence of 55 years in a case where a young man was woken in the middle of the night by several sheriffs who told him "we need to go and talk."  The young man said, "ok." Kaupp was in his boxer shorts and taken to the scene where the body had been found and then to the police station.   The officers had no probable cause and no warrant for Kaupp's arrest.

The Supreme Court reversed, holding that this was an unlawful arrest and that the confession obtained had to be suppressed.

The confession was invalid because despite the fact that Kaupp had responded "Okay" to the sheriff's professed need to "go and talk," this response was merely "submission to a claim of lawful authority." In other words, it was not a consent given voluntarily or knowingly, it was just an automatic response to the show of authority by the various armed, uniformed police officers who spoke in a "tone of voice indicating that compliance with the officer's request might be compelled." given the record in the case, it was debatable as to whether or not one of the officers had a gun drawn.  Id. at 626-627.

The Supreme Court ruled the same in Johnsona v. United States, 333 U.S. 10, where the police, smelling burning opium, knocked on Johnson's door and told her that she should consider herself under arrest because they were going to arrest her.  The Court reversed te conviction because the police could have and should have gotten a warrant.  In addition, Johnson's "consent" to enter and to speak were not voluntary; her compliance was mere acquiescence to a claim of lawful authority on the apart of the police who gave her no choice but

to open up her room and allow herself to be arrested and questioned without any advisal or respect of her rights.

Likewise, here, Mr. Ramos and the other undocumented people merely complied with the agents' show of authority, including full uniform, marked vehicles, in the dark in a desolate area with no place of refuge, where the officers were armed, with a large law enforcement canine. Likewise, there was no precise confirmation that a gun was drawn, but the officers were armed. There was no way the aliens could feel free to leave, just as Agent Nye testified. Nor were they allowed to refrain from speaking. They were handcuffed to the ground and every part of their bodies and property were searched. They had no choice. As in Kaupp, a reasonable person would not have felt free to get up and walk back to the border or anywhere else for that matter. Had they gotten up, much greater force would have been used on them. There is no voluntary movement or response under this scenario.

As in Kaupp, "Kaupp's "Okay" in response to Pinkin's statement is no showing of consent under the circumstances. Pinkins offered no choice, and a group of officers rousing an officer out of bed in the middle of the night with the words, "we need to talk,: presents no option but 'to go.'" Id. Mr. Ramos and the five others were in the same position. Their was no way they could resist the arrest or the search of their person or bodies. The agents' questions about their birth place, the names and birth places of their parents and their nationality were not the result of acts of free will.

Finally, the Supreme Court pointed out the fact that the sheriffs routinely handcuff detainees for officer safety or the fact that Kaupp did not resist was no significant. Id. P.632. Referencing the

officers's motivation for their personal safety has nothing to do with whether a detainee felt free to leave or to remain silent. "As for the lack of resistance [by Kaupp to the use of force], failure to struggle with a cohort or deputy sheriffs is not a waiver of Fourth Amendment protection, which does not require the perversity of resisting arrest or assaulting a police officer." Id.

Accordingly, here, there was a full blown arrest. Probable cause or no probable cause, the six undocumented people should have been Mirandized and their statements were not given voluntarily. Accordingly, the statements and all evidence derived from this unlawful arrest must be suppressed. Wong Sun v. United States, 371 U.S. 471 (1963).

The suppression of statements and the fruits of the Border Patrol agents' investigation at the Border Patrol station should be suppressed. The government arrested Mr. Ramos illegally. They failed to respect his rights by failing to read him his rights and by obtaining very incriminating information him without his consent or a knowing and intelligent waiver of his rights. Then, they took him to the station to investigate him further and based their investigation on the information he gave them. The evidence, including fingerprints and prior criminal history and immigration history should not be used against him as they are fruits of the unlawful arrest. Johnson v. United States, 333 U.S. 10. *See also*: Taylor v.United States, 457 U.S. 687 (1982) where the Supreme Court reversed where police arrested Taylor without probable cause based on s jailhouse tip. They obtained his fingerprints and then confronted him with a matching set from the crime scene and he confessed. The Court held the fingerprints were

poisonous fruit as was the confession.

## II.
## CONCLUSION

**Given the facts and legal authority in this particular case, Mr. Ramos respectfully asks this Court to grant his motion to suppress.**

Dated: August 19, 2008                /s/Joan Kerry Bader
                                      Joan Kerry Bader for defendant
                                      Ramos